In re Julian C. DANELSON, Debtor.

Bankruptcy No. 86–40747.

United States Bankruptcy Court,
D. Montana.

April 8, 1987.

John A. Forsythe, Billings, Mont., for debtor.

Malcolm H. Goodrich, Billings, Mont., for FLB.

Frank D. Meglen, Asst. U.S. Atty., Billings, Mont., for FHA.

Dunlap & Caughlan, Butte, Mont., trustee.

## ORDER

JOHN L. PETERSON; Bankruptcy Judge.

In this Chapter 12 case, hearing on confirmation of the Debtor's Plan was held on

March 24, 1987, with the Debtor present together with counsel for the Debtor, Farmers Home Administration (FHA) and Federal Land Bank of Spokane (FLB), and the Trustee. The Plan was modified on March 19, 1987, to provide for payments to FLB over a 25 year period after curing of defaults within three years. FLB has consented to the Plan. Objections to the Plan were filed by FHA and the Trustee. The objections of FHA were filed late in violation of the Order of this Court requiring objections to be filed five days before the hearing, and upon motion of the Debtor, those objections were denied. See *In re Newell*, 70 B.R. 116 (BAP 9th Cir.1986). However, FHA did fully participate in the hearing on the confirmation of the Plan, which included an appraisal of Debtor's real property. The Trustee objections concern failure of the Plan for payment of Trustee's fees on payments to creditors which are included in the Plan but to be made directly by the Debtor, rather than through the Trustee. At hearing, the Debtor consented to modifying the Plan to cure the Trustee objections, but has not yet filed such modification to the Plan.

The evidence of the Debtor places the value of the Debtor's farm at $272,730.00, against which there are three mortgages, to-wit: FLB for $185,538.00 in first position, Randy Smith, contract seller, for $76,795.00 in second position, and FHA, which is in third position, and owed $340,408.00, together with an additional contingent liability of $230,552.00, arising from the Debtor co-signing a note made by Lazy D Diamond Ranch, Inc. The Debtor's appraisal of the property, if accepted, leaves FHA secured only to the extent of $10,397.00. Under the Plan, the secured debt is proposed to be paid over 10 years, with interest only for three years. While the Plan fails to specify the rate of interest to be paid on FHA secured debt, the summary of Plan payments provides FHA interest to be paid at $832.00 for the first three years.

The Plan has four separate classes of creditors. Class A creditors are secured creditors of the Debtor's real property and include FLB, Randy Smith and FHA. The amount owed to Randy Smith on the Con-

tract For Deed of one of the parcels of Debtor's real property is current and is to be paid at $15,000.00 per year over the life of the contract, which exceeds five years. As noted above, FLB has consented to the Plan, and thus its lien rights and payments are not at issue. FHA will retain its third position against the Debtor's real property. In that regard, the Debtor presented appraisal testimony based on the three recognized approaches to value, namely, (1) earnings or income approach, (2) market data or comparable sales approach, and (3) cost approach. According to the appraiser, the earnings approach is the most realistic approach to value because it considers the stream of income which the property is likely to produce during its economic life. The three approaches produced three different values, to-wit:

| | | |
|---|---|---|
| 1. Market data value | – | $311,860.00 |
| 2. Earnings or Income | – | 272,730.00 |
| 3. Cost approach (land sales plus improvements) | – | 331,300.00 |

The cost approach involved estimating the value of the land from comparable sales and depreciating the value of improvements on the property. The market data valuation was based on three comparable sales made in 1985 and adjusted for time and difference in land quality. The appraiser testified that recent sales indicate the market data approach was too high because of prolonged drought in the area and lower grain commodity prices which indicate at least a 10% decline in value over the last year. The income approach, which was adopted by the appraiser as the best indicator of value, was based on production of crops (wheat, fallow, hay and pasture) from typical management and average yields if the property were rented by the owner, with deduction for fixed operating expense of taxes, insurance, improvements and management fees, resulting in net earnings, which were capitalized at 3%. The net earnings from the land were projected at $8,181.88, which means that at 3%, the return on capital gives an indicated market value of $272,730.00. ($272,730.00 × 3 = $8,181.00). The FHA developed from the appraiser that she failed to take

into consideration in the income approach any income to be derived from state leases, which the appraiser conceded would raise the appraisal slightly if income from 232 additional acres on state lease was included. One state lease has one year before it expires and the other lease has a remaining term of seven years. In contrast to the above assumed rental value which is based on crop production only, the Debtor projects gross income for 1987 of $77,-400.00 from cattle, grain and government subsidy payments, with operating expenses of $18,819.00, leaving $58,581.00 for payments to creditors, for living expenses, and state lease rentals. It appears the assumed rental figures for grain production are fairly comparable.

█ In Chapter 12 cases where the property will be held as a going-concern to pay reinstated mortgages and delinquent debt, the value under 11 U.S.C. § 506(a) should be based on fair market value, not a liquidation value. *In re Yoder*, 32 B.R. 777 (Bankr.W.D.Pa.1983); *In re Fursman Ranch*, 38 B.R. 907, 909 (Bankr.W.D.Mo. 1984):

> "The Court is obliged to value collateral 'in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing ... on a plan affecting such creditor's interest'. The legislative history suggests that the valuation is to be made on a case by case basis, consistent with the time of the valuation. Senate Report No. 95–989, 95th Cong.2d Sess. (1978) 68, U.S.Code, Cong. & Admin. News 1978, P. 5787, reprinted in App. 3 *Collier on Bankruptcy* (15th Ed.); * *."

See also *In re Martin*, 66 B.R. 921, 927 (Bankr.Mont.1986). I find the fair market value of Debtor's real property is $272,-730.00 based on the appraisal testimony of the Debtor's expert witness. Such value compares favorably with the discounted market data valuation of $280,000.00 ($311,860.00 less 10%). Any increase in value from consideration of state lease income would be nominal.

█ Since it is incumbent upon the Court in the discharge of its duties to inde-

pendently determine whether a Chapter 12 Plan meets all of the requirements necessary for confirmation, *In re Martin*, supra at 925, I must further determine that the Plan is feasible and that each creditor to be paid under the Plan will receive more than it would if the Debtor's property were liquidated. A few principles of Chapter 12 should be examined. The Plan must contain three distinct provisions:

1. The Debtor shall turn over to the Trustee all future earnings or income to the extent such income is required to carry out the Debtor's Plan. In this case, all of the Debtor's income is needed to fund the Plan.

2. The Plan must provide for full payment, in deferred cash payments, of all Section 507 priority claims, unless the creditor and Debtor agrees to some other treatment of such claims. In this case, there are 507 priority claims of administrative expenses for Trustee's fees and attorney fees for the Debtor.

3. If the Plan classifies claims, it must treat each claim within the class the same, unless the creditor in such class consents to less favorable treatment. 11 U.S.C. § 1222(a)(3). Under the proposed plan, each secured creditor is classified either in Class A or Class B, and are treated equally up to the value of their collateral. The problem under the Plan has to do with Class C (unsecured) creditors, where payment in full is proposed to be made to a feed supplier, while the unsecured portion of the FHA claim will be paid only to the extent the balance of disposable income is available, and then the balance of the FHA debt is discharged. Such treatment is unequal among claimants in the same class.

I borrow from Chapter 13 precedents from cases dealing with treatment of creditors in the same class because § 1222(a)(3) is identical to § 1322(a)(3). *In re Maloney*, 25 B.R. 334 (BAP 1st Cir.1982), holds:

> "The provisions of § 1322(a) are mandatory, and a document which fails to include the required provisions is insufficient to constitute a Chapter 13 plan. See, e.g. *National City Bank v. Purdy (In Re Purdy)*, 16 B.R. 847, 850 (D.C.N.

D.Ga.1981). Accord, *Foster v. Heitkamp (In Re Foster)*, 670 F.2d 478, 483–84 (5th Cir.1982)."

\*     \*     \*     \*     \*     \*

\* \* \* the document classifies claims but does not provide the same treatment for each claim within a particular class. 11 U.S.C. 1322(a)(3)."

In the case of *In re Stewart*, 52 B.R. 281, 283 (Bankr.W.D.N.Y.1985), states:

"The right to classify claims is contained in the above sections [§ 1322(a)(3) and 1122(a) and (b) ] of the Code. If a plan classifies a claim, it must provide the same treatment to each claim within a particular class. They may not discriminate unfairly against any class designated and a claim may be placed in a particular class only if such claim or interest is substantially similar to the other claims of that class."

We are not dealing in this case under the proposed plan with treatment of different classes of creditors, see, e.g. *In re Kovich*, 4 B.R. 403 (Bankr.W.D.Mich.1980); *In re Rutledge*, 31 B.R. 897 (Bankr.E.D.Tenn. 1983); *In re Wolff*, 22 B.R. 510 (BAP 9th Cir.1982), but rather with treatment of unsecured creditors placed in the same class.

In regard to the unsecured claims as a class, unsecured creditors may be classified in different classes as long as there is no unfair discrimination against any particular class. § 1222(b)(1). Under the proposed Plan, all unsecured creditors are placed in one class and thus § 1222(b)(1) has no application.

In order to confirm a Chapter 12 Plan, the requirements are set forth in Section 1225. The Plan must comply with the provisions of Chapter 12 and applicable provisions of Title 11. § 1225(a)(1). In this case, the Plan violates § 1222(a)(3). All fees required under 28 U.S.C. 123, or required under the Plan, to be paid before confirmation, must have been paid. § 1225(a)(2). The filing fees and charges have been paid in this case. The Plan must be proposed in good faith and not by any means forbidden by law. § 1225(a)(3). An

issue on this requirement has been raised by FHA. The good faith requirement brought forth a position in early cases under the 1978 Code that a Plan lacked good faith if no dividend was to be paid to the unsecured creditors. *In re Terry*, 630 F.2d 634 (8th Cir.1980); *In re Burrell*, 6 B.R. 360 (N.D.Cal.1980), rev'g 2 B.R. 650 (Bankr.N.D.Cal.1980). The pronouncements in these Chapter 13 cases were changed by the Bankruptcy Amendments and Federal Judgeship Act of 1984 (BAFJA), P.L. 98–353, which provides that the Plan must provide for payments to unsecured creditors from all of the Debtor's projected disposable income over the three-year period. § 1325(b)(1)(B). Section 1225(b)(1)(B) adopts the same rationale. In the present case, all of the Debtor's projected disposable income is committed to the Plan. Section 1225(a)(4), the "best interest of creditors test" taken from Chapters 11 and 13, provides that unsecured claims must receive under the Plan not less than such claimants would be paid out under the Chapter 7 liquidation. This determination must be made by the Debtor as of the effective date of the Plan, by use of a liquidation analysis. In the present case the Debtor's liquidation analysis projects that upon forced sale for cash, the Debtor's land would bring $200,000.00, which is insufficient to pay the first two lienholders of the collateral. Under the Plan, the first two liens would be paid in full, and a small portion of the FHA debt equal to the value of its collateral ($10,397.00) would be paid. The same is true of liquidation of the farm machinery and cattle. Thus, the Plan satisfies the best interest test. Under Section 1225(a)(5), each allowed secured class under the Plan must either have accepted the Plan, or the Plan must provide that each secured claimant will retain a lien on collateral securing the claim, and as of the effective date of the Plan, that claimant receives in value an amount not less than the allowed amount of the claim. A third alternative is for the Debtor to surrender the collateral securing the claim to the creditor. Under the Debtor's Plan, each secured creditor retains its lien in the collateral up to the present value of the collateral and in

the amount of the secured claim. Thus, this element of confirmation is satisfied. Finally, the Plan must be feasible, i.e., the Debtor must be able to make all payments required by the Plan. § 1225(a)(6). If the Trustee or unsecured claimant objects to confirmation of the Plan, the Plan can be confirmed only if, as of the effective date of the Plan, the value of property to be distributed under the Plan is not less than the amount of the claim or the Plan provides for use of all of the Debtor's "disposable income", which means income received by the Debtor which is not reasonably necessary to be spent for the Debtor's family support and maintenance, or necessary to continue, preserve and operate the Debtor's business. § 1225(b)(2). Under the proposed Plan, all disposable income is committed to payment to creditors. However, the Plan fails to provide for payment of Trustee's fees and expenses. Under Chapter 12, unlike Chapter 11, Section 1202(a) provides that a Trustee be appointed in every case. The Trustee's duties include accounting for all property received [11 U.S.C. § 704(2)]; investigating the affairs of the Debtor [11 U.S.C. § 704(3)]; examining claims [11 U.S.C. § 704(5)], opposing discharge "if advisable" [11 U.S.C. § 704(6)], advising parties in interest about the administration of the estate [11 U.S.C. § 704(7)], making a final report and accounting [11 U.S.C. § 704(9)] and in some cases, if the Court so orders, the Trustee must investigate the business of the Debtor as to the advisability of removing the Debtor from possession for fraud, dishonesty, misconduct or mismanagement. § 1202(b)(2). The Trustee is to appear at any hearing which concerns valuation of collateral, confirmation of a plan, modification of a plan and sale of property. § 1202(b)(3)(A), (B), (C), (D). The Trustee is to ensure that the Debtor makes all payments required under the Plan, § 1202(b)(4), and file income tax returns for the estate. § 1231(b). Compensation for a Chapter 12 standing Trustee may not exceed the lowest annual rate of basic pay for an equivalent of GS–16 of the general schedule set forth in 5 U.S.C. § 5332 ($63,-135.00). The Trustee is to receive a percentage fee of a maximum of 10% of the first $450,000.00 of Plan payments plus 3% of Plan payments in excess of $450,000.00, based on the maximum annual compensation allowed and the Trustee's actual necessary expenses. The Trustee must then actually pay into the treasury any amounts collected as compensation which exceeds 5% of all payments made under the Plan, plus any amount the percentage fee in all cases exceeds the amount of compensation fixed by the Court. In the case of standing Trustee, the actual compensation cannot exceed 5% of all Plan payments. During the term of the Plan, payments under the Plan, excluding operating expenses and family support, total $46,621.00 for each year, which requires a Trustee's fee of $2,331.05 per year, plus actual, necessary expenses. The Plan has sufficient income to make such payments based on income projections of the Debtor, but no provision for Trustee's fees and expenses are made in the Plan. Since the Plan does not comply with §§ 1222(a)(3) and 1202, the Plan cannot be confirmed.

IT IS ORDERED the Debtor's Chapter 12 Plan is denied confirmation, with leave of the Debtor to file modifications to the Plan within 10 days of this Order.