**In re ROBINSON RANCH, INC., Debtor.**

**Bankruptcy No. 87–20100.**

United States Bankruptcy Court, D. Montana.

July 2, 1987.

William L. Madden, Jr., Mark D. Refling, Bozeman, Mont., for debtor.

William Driscoll, Helena, Mont., for Metropolitan.

Malcolm Goodrich, Billings, Mont., for PCA.

Dunlap & Caughlan, Butte, Mont., trustee.

## ORDER

JOHN L. PETERSON, Bankruptcy Judge.

Hearing was held on June 5, 1987, on the Debtor's Chapter 12 Plan together with objections filed by Metropolitan Life Insurance Company (Metropolitan). At the hearing, Interstate Production Credit Association (PCA) withdrew its objections to the Plan upon condition that if the Plan as amended is not confirmed, PCA may renew its objections to any modified Plan. Under agreement with the Debtor, PCA's debt has been set at $194,234.41 to be payable annually in the amount of $21,278.00, which includes interest at 9% per annum. In return, PCA will provide annual operating funds to the Debtor in accordance with PCA's credit standards, and the interest rate fixed by the parties is not to be construed as an admission by PCA that such rate constitutes the prevailing market rate of interest. The Debtor has few unsecured creditors totaling $25,031.09, which will be paid pro rata over three years. The major obstacle with the Plan concerns Metropolitan, which, at the date of the Chapter 12 filing, was owed $900,442.00, based on two separate notes and mortgages. One mortgage in the sum of $682,300.00 is secured by Debtor's real property in Park and Gallatin Counties, Montana, known as the home place. The second mortgage in the sum of $218,124.54 is secured by property known as the Ringling property located in Meagher County, Montana.

Metropolitan and the Debtor have agreed that the value of the Ringling property is $438,240.00. Under the Plan, that property will be deeded to Metropolitan in full satisfaction of the Ringling mortgage and partial payment of the home place note. The dispute between Metropolitan and the Debtor involves the value of the home place and the interest rate which the Debtor's Plan proposes on the remaining secured debt. Under the Plan, based on expert appraisal testimony of the Debtor, the value of the home place is fixed at $375,000.00, which, after credit for the Ringling property, results in payment due Metropolitan of $151,760.00 as a secured claim. The Plan proposes to pay such sum over 20 years at 9% interest. The note and mortgage of Metropolitan dated June 29, 1981, on the home place calls for interest at 11¼% (variable), with final balance due January 1, 2001. It is agreed that Metropolitan released the mortgage of June 29, 1981, on the Ringling place, so that such note is not cross-collateralized. Metropolitan has a second lien on irrigation

equipment of the Debtor, but there is no equity in said property after applying the PCA first lien. PCA has a second mortgage interest on the home place to secure its debt. Metropolitan's expert witness appraised the home place at $467,507.00, so that even under that appraisal, Metropolitan is undersecured.

Under the Plan, the value of Metropolitan's two claims is fixed at $590,000.00 computed by adding the value of the home place ($375,000.00) with the secured debt on the Ringling property ($215,000.00).[1] The Plan then deducts the value of the Ringling property ($438,240.00) from the total secured debt ($590,000.00)—$438,240.00), leaving a secured obligation of $151,760.00, to be paid over 20 years at 9% interest ($16,625.31 per year). Metropolitan would retain its first mortgage position on the home place, and the balance of its unsecured claim would participate pro rata in the three annual payments to unsecured creditors. After the three year plan payments are completed, the balance of the debt would be discharged. The effect of the Plan will be to elevate the claim of PCA totaling $205,754.51 from an undersecured status to a full secured claim with its first lien on the chattels ($50,000.00) and the balance of the claim fully secured by remaining equity in the home place ($223,-240.00).

Metropolitan's objections to the Plan is that it is not feasible in that the income and expense projections of the Debtor are not accurate, the restructured interest rate of 9% is not representative of fair market, the Plan improperly proposes releases of guarantors and the Plan is discriminatory because it takes PCA, a secured creditor, from an undersecured status of over $150,-000.00 to a fully secured status by reason of its second mortgage on the home place.

■ As is apparent from the above contentions of the parties, valuation of the home place is critical to confirmation of the Plan. The starting point on valuation is Section 506(a) of the Code which states:

"§ 506. Determination of secured status.

(a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest."

In Chapter 12 cases where the property will be held as a going-concern for the production of income to pay reinstated mortgages and subsequent debts, the value under 11 U.S.C. 506(a) should be based on a fair market value, not a liquidating value. *In re Yoder*, 32 B.R. 777 (Bankr.W.D.Pa. 1983); *In re Fursman Ranch*, 38 B.R. 907, 909 (Bankr.W.D.Mo.1984):

"This court is obliged to value collateral 'in light of the purposes of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing—on the plan affecting such creditor's interest'. The legislative history suggests that the valuation is to be made on a case by case basis, consistent with the time of the valuation. Senate Report No. 95–989, 95th Cong.2d Sess. (1978) 68, U.S.Code Cong. & Admin.News 1978, P. 5787, reported in App. 3 *Collier on Bankruptcy*, (15th Ed.); * * *."

See also *In re Martin*, 66 B.R. 921, 927 (Bankr.Mont.1986). The valuation for the purposes of 1225(a)(5)(B)(ii) is to be fixed

---

1. The Debtor acknowledges the Ringling property note is presently $218,124.54, and bears per diem interest at $105.65 per day, so that the claim will have to be adjusted to reflect the true amount of the secured debt.

"as of or close to the effective date of the Plan". *In re Cook,* 38 B.R. 870 (Bankr. Utah 1984). In regard to value, *In re Courtright,* 57 B.R. 495, 496 (Bankr.Or. 1986), states:

"The court believes that it should start with the fair market value of the property as that term is generally understood to be, i.e., the price which a willing seller under no compulsion to sell and a willing buyer under no compulsion to buy would agree upon after the property has been exposed to the market for a reasonable time. The court should not use that value which would be obtained through a forced or quick sale."

The appraiser for Metropolitan expanded on such definition to include that the buyer should be knowledgeable of all uses and purposes for which the property is adopted and for which it was or is capable of use. Three approaches to fair market value are generally recognized, to-wit: (1) the market data or comparable sales approach; (2) the income approach, and (3) the cost or replacement approach.

■ In this case, Metropolitan's appraiser used the market data and income approach in fixing his final opinion on value, while the Debtor's valuation expert used an income approach based on the carrying capacity of the ranch. The Debtor's appraiser stated that comparable sales were outdated and due to current adverse economic conditions affecting agriculture, such sales would not provide a proper basis for valuation. In contrast, Metropolitan's appraiser conceded that the value of agricultural land has decreased 40 to 50% during the time period from 1983 to the present and there have been very few sales during such period on which to make a good comparison. Metropolitan, nevertheless, used 9 sales, 7 in 1985 and 2 in 1984, as an indication of market value, after making adjustments for time, location, and quality of land. On the basis of comparable sales, Metropolitan values the home place at $467,507.00.

Both parties employed an income appraisal. The Debtor's appraiser employed a "working ranch" formula wherein the animal unit capacity of the ranch on a sustained basis is multiplied by $1,500.00 per animal unit, being the average price on today's market. The home place has a historical carrying capacity of 250 animal units on a year around basis. Since it takes two tons of hay to sustain one animal unit, the ranch needs to produce 500 tons of hay annually. The principal owner and manager of the Debtor testified the home place puts up 800 tons of hay a year, and that in addition, Debtor has four leases on property which produce 400/500 tons per year. In this regard, the Debtor's projected income figures include sale of 1,300 tons of hay per year, so that the sustained yield of hay production of 1,800 tons from the deeded and leased land is questionable. Finally, Debtor's appraiser states the location of the home place, with attendant irrigation costs makes the ranch an expensive operating ranch. The appraiser stated that the location was a negative factor for sub-division of the property or for recreational use, factors which I consider to be irrelevant since the use of the property under the Plan is solely agricultural. Metropolitan's appraiser fixes the carrying capacity at 1,106 Animal Units Months (AUM), which is 1/12th of an annual unit. Thus Metropolitan has a carrying capacity of just under 100 animal units. If such is true, the Debtor's appraisal is too high by a factor of over two times.

Metropolitan's income approach was based on cash rental value ($34,087.00) less estimated expenses ($11,360.00) for a net income of $22,727.00, capitalized at 5%. The valuation from such approach is thus fixed at $454,540.00. The appraiser adopted the market data value of $467,-507.00, even though he conceded the data base was slim and outdated. Metropolitan also fixed the value on the ranch improvements totaling $79,200.00. The Debtor's appraiser evidently included such improvement value in the $1,500.00 per annual unit, although the appraisal is not definite on such matter. Debtor's approach does list all of the improvements but assigns no individual value to them. If the improvement values are taken at $79,200.00, then the land value fixed by the Debtor would be $295,880.00, compared to Metropolitan's

land values of $388,507.00. The appraisers have credibility, and as is usual in valuation of property, the differences are based on an honest difference of opinion as to the value. Both appraisers concede agricultural land values have fallen precipitiously in the last four years, so that, with a tight market, the approach to value on a comparable sales basis is a questionable judgment call. From the income approach, and particularly the data on income and expense presented in the Plan and at the hearing, it is obvious the valuation of Metropolitan is high, while the appraisal of the Debtor is somewhat low due to the availability of cash reserves after payment of expenses and debt. Accordingly, I find and conclude a valuation which represents a continuum between the land values is appropriate. Therefore, I fix the valuation of the Debtor's home place at $421,350.00, which values the land at $342,150.00 and improvements at $79,200.00. See *e.g., In re Bouquet Investments*, 32 B.R. 988 (Bankr.C.D.Cal.1983); *In re High Sky, Inc.*, 15 B.R. 332 (Bankr.M.D.Pa.1981).

■ Metropolitan also contends that the proposal in the Plan to pay interest at 9% does not represent a market rate of interest. The test to be applied is discussed in *In re Janssen Charolais Ranch, Inc.*, 73 B.R. 125, 128, 4 Mont. B.R. 290, 295–296 (Bankr.Mont.1987), adopting the language of *In re Welco Industries*, 60 B.R. 880, 882, 883 (BAP 9th Cir.1986). The rate is the prevailing market rate for the type and quality of the loan at issue. In this case, evidence of the Debtor, which I find is credible, shows the prevailing rate is 9% on 20 year contracts for deed, with interest rate on commercial loans fixed at 2% over prime of 8¼%. However, the last seven sales in the area involved contracts for deed, not commercial lenders, and thus the market rate is basically fixed in the area based on contract rates of 9%. I find the interest rate of 9% is the prevailing market rate.

■ The objection of Metropolitan that PCA's secured position is vastly improved under the Plan is correct, but said objection has no legal basis. Under Chapter 12, the Plan may be confirmed over the dissent of the secured creditor if the requirements of § 1225(a)(5)(B)(i) and (ii) are met. This section provides the Court shall confirm a Plan with respect to an unaccepting secured creditor if:

> "(B)(i) the Plan provides that the holder of such claim retains the lien securing such claim; and (ii) the value, as of the effective date of the plan, of property to be distributed by the trustee or the debtor under the plan on account of such claim is not less than the allowed amount of such claim;"

As held in *Janssen Charolais Ranch, Inc.*, supra, at 127:

> "Under 1225(a)(5), the rights of the nonconsenting secured creditor can be modified only if, among other things, the creditor retains its lien on the security and receives collateral with a present value not less than the allowed amount of the secured claim."

*In re Danelson*, 77 B.R. 261, 4 Mont.B.R. 214, 221 (Bankr.Mont.1986) further explains:

> "Under Section 1225(a)(5), each allowed secured class under the plan must either have accepted the plan, or the plan must provide that each secured claimant will retain a lien on collateral securing the claim, and as of the effective date of the plan, that claimant receives in value an amount not less than the allowed amount of the claim. A third alternative is for the debtor to surrender the collateral securing the claim to the creditor. Under the debtor's plan, each secured creditor retains its lien on the collateral up to the present value of the collateral and in the amount of the secured claim. Thus, this element of confirmation is satisfied."

Metropolitan is satisfied under the Plan by retaining its first mortgage position in the home place—a position which substantially secures its debt. The fact that another secured creditor, which is providing operating funds to the debtor, has improved its secured position is of no consequence to Metropolitan. Indeed, *Danelson*, supra, at 224 states:

"In the case of *In re Stewart*, 52 B.R. 281, 283 (Bankr.W.D.N.Y.1985), states:

> The right to classify claims is contained in the above sections [§ 1322(a)(B) and 1122(a)(B)] of the Code. If the plan classifies a claim, it must provide the same treatment to each claim within a particular class. They may not discriminate unfairly against any class designated and a claim may be placed in a particular class only if such claims or interest is substantially similar to the other claims of that class."

Under Section 1222(b)(2) and (9), a Chapter 12 plan may properly designate each secured claim as a separate claim and modify such claim in accordance with 1225(a)(5). The only discrimination test applies to unsecured creditors under 1222(b)(1). See *In re Wolff*, 22 B.R. 510, 512 (BAP 9th Cir.1982), (discrimination among classes of unsecured creditors must have a reasonable or rationale basis). Metropolitan's objection on this issue is without merit.

Next, Metropolitan complains that the Plan releases personal guarantors on its note. After granting Metropolitan substantial collateral in the home place, the Plan provides that "all other security held by this creditor, including personal guarantys, shall be released". In this regard, the guaranty is a contingent liability, to be exercised by Metropolitan in the event of non-payment of the secured claim. Metropolitan failed to submit any evidence as to the value of such security, if indeed, it has value. If Metropolitan's objection is that it can proceed against the guarantors Russell Robinson and Frances Robinson in the discharged or unsecured portion of its claim, then the objection is well taken. The matter is governed by Section 1201 dealing with co-debtor's stay of a consumer debt, and is placed into issue by expansion of the co-debtor stay through the process of a confirmed plan. Section 1201 is inapplicable to the parties in this case because the note and mortgage on the home place are not a consumer debt. *In re Ikeda*, 37 B.R. 193 (Bankr.Hawaii 1984) (Co-debtor stay of 11 U.S.C. 1301 does not apply to debts secured by such property); *In re Stein*, 18 B.R. 768 (Bankr.S.D.Ohio 1982), *In re Burgess*, 22 B.R. 771, 773 (Bankr.M.D.Tenn. 1982). None of the parties have presented any case authority in support of their respective position, and the Court adopts the rationale of the Chapter 13 cases, since the two Code provisions are identical. In *Kalispell Feed and Grain Supply, Inc.*, 55 B.R. 627 (Bankr.Mont.1985), this Court adopted the reasoning of *In re Mahaffey v. E–C–P of Arizona, Inc.*, 40 B.R. 469, 12 BCD 164, 166 (Bankr.Ariz.1984), which held:

> "In my view, enjoining a creditor from proceeding against a third-party guarantor, even though such guarantor is a key employee of the debtor's business would set a dangerous precedent, absent evidence that such guarantor will contribute personal assets to the reorganization."

*Kalispell Feed and Grain*, supra, also holds that the general rule of suretyship where the guarantor is sued for the debt and pays the obligation so that the right to demand payment from the debtor changes hands, is not applicable in bankruptcy. *In re Metal Center, Inc.*, 31 B.R. 458 (Bankr. Conn.1983). Finally, if 1201 does apply, Section 1201(c)(2) states that a stay against a co-debtor or guarantor does not apply to the extent the "plan filed by the debtor proposes not to pay such claim". In this regard the holding of *In re Jacobsen*, 20 B.R. 648, 650 (BAP 9th Cir.1982), is applicable:

> "11 U.S.C. § 1301(c)(2) states that the stay insulating a co-debtor from suit shall be inoperative to the extent that 'the plan filed by the debtor proposes not to pay such claim ...'
>
> The foregoing language is unqualified. There is no limitation on the creditor's right to sue the co-debtor for the amount not provided for by the plan. There is no requirement that suit be deferred while the debtor pays under the plan during a period of years. *In re Holmes*, 9 B.R. 454, 4 C.B.C.2d 259 (Bankr.D.C.).
>
> The foregoing conclusion is consistent with the legislative history of § 1301(c)(2). 'The court must grant relief to the extent that the debtor does not

propose to pay, under the plan, the amount owed to the creditor.' H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 426 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6382 (Emph. supp.). It would make little sense to defer such relief when it is known that the creditor will never receive the unprovided-for amount, under the plan, from the debtor. To put it otherwise, the debtor has in effect stated the respective dimensions of his liability and that of the co-maker. Section 1301(a)(2) provides the creditor with freedom to pursue, to the latter extent, its claim against a co-debtor."

In sum, the Plan proposal to change the obligations of the guarantors is contrary to the provisions of Chapter 12 and Metropolitan's objection on this issue has merit.

Finally, on the issue of feasibility, it would now be premature to decide such issue in view of the valuation of the property fixed by the Court. The Debtor will have to amend the Plan in accordance with such valuation.

IT IS ORDERED the Chapter 12 Plan is denied confirmation with leave of the Debtor to amend the Plan within 10 days.