**In re WRB WEST ASSOCIATES JOINT VENTURE a/k/a The Madison Addition, Debtor.**

**In re WRB WEST ASSOCIATES, INC. a/k/a The Madison Addition, Debtor.**

Bankruptcy Nos. 89–21220–011, 89–21221–011.

United States Bankruptcy Court, D. Montana.

Oct. 12, 1989.

---

Michael J. Lilly, Advanced Technology Park, Bozeman, Mont., for debtor.

Charles W. Hingle, Billings, Mont., for MAILP and Deseret Federal Sav.

Neal G. Jensen, Great Falls, Mont., Asst. U.S. Trustee.

### ORDER

JOHN L. PETERSON, Bankruptcy Judge.

In these Chapter 11 consolidated cases, the Debtors have filed a Motion under section 363 of the Bankruptcy Code seeking use of cash collateral which is subject to a

---

**2.** Article VI, Constitution of the United States.

valid mortgage held by Deseret Federal Savings and Loan Association, assigned post-petition to Madison Addition Investments Limited Partnership (MAILP). While the Debtors' Motions as filed also seek Court authorization to allow it to sell unimproved real estate lots, by reason of the nature of the business of WRB West Associates, Inc., owner of the property (hereinafter "Debtors"), it is not necessary to authorize such sales, as is more fully explained in this Order. Objection to the use of cash collateral has been filed by MAILP[1], and hearing on said Motion and Objections was held on September 28, 1989. Memorandum by each respective party has now been filed and the matter is ripe for decision.

This case involves a subdivision located in West Yellowstone, Montana, which is contiguous to Yellowstone National Park, and is the west entrance to the Park. The growth of West Yellowstone had been severely restricted as it is completely surrounded by National Park Service and United States Forest Service property. In 1981 Lewis Robinson and Robert Russell were able to exchange other property owned by them for a parcel of property comprised of approximately 163 acres situated adjacent to the south and west of the town of West Yellowstone.

Once the exchange was completed, Robinson and Russell commenced plans to annex the property to the town of West Yellowstone as a high quality residential development, known as the Madison Addition.

During the early stages of the development, Robinson and Russell were approached by Robert H. Walker who expressed a desire to purchase the entire development. In 1984, the development was raw land and Robinson and Russell offered to sell the raw land to Walker for $2,700,000.00 subject to an appraisal to verify the reasonableness of the price. After the appraisal was completed, the raw land was sold by Robinson and Russell to Walker for the sum of $2,700,000.00. Payment was made by a down payment of $1,500,-000.00 to West Associates Limited in which Robinson and Russell were the general partners and a Promissory Note in the sum of $1,255,674.13 and a Second Mortgage on the property was issued by Walker's corporation, WRB West Associates, Inc., and WRB West Associates Investments to West Associates Limited.

Walker then proceeded to complete the development of the Madison Addition as a high quality development with very attractive and aesthetic features. All of the streets were paved, water, gas and sewer lines were installed. Utilities and telephone lines were placed underground and a water tower was built to assure that all the requirements of a quality development were present. Zoning was obtained in connection with development and for the first time the town of West Yellowstone was zoned. In addition to the zoning, protective covenants were placed on the property to assure that it would continue as a high quality development. The property was annexed to the town of West Yellowstone as a fully completed subdivision without any special improvement districts. Thus, by 1984, interstate lands sales in the Madison Addition were exempt from requirements of the Interstate Land Sales Full Disclosure Act and the property could be marketed on a nationwide basis.

Prior to the subdivision being completed and shortly thereafter, lots within the subdivision were sold, some at a discount in order to serve as a promotion for future sales and development. Initial sales of 137 Single Family Residential Lots and one Duplex Lot, even with the discount, brought in a total of $2,023,126.00. This left 167 single Family Residential Lots and 34 Duplex Lots for sale. In addition, the acreage designated for planned unit developments consisting of four tracts of 21, 10 and 7 and 5 acres respectively, all remains to be sold. These four tracts make available land for

---

**1.** MAILP states the Debtors' Motion seeks authority to sell the mortgaged property free and clear of liens under § 363(f), with valid liens to attach to the proceeds of sale. The Debtors also cite such subsection, but the Court believes § 363(f) is not applicable to the application under consideration for the reasons stated herein.

approximately 836 residential multi-family units.

In order to promote development, a tract of eight and one half acres was donated by the developers to the school system of West Yellowstone; a lot was donated to the Community Protestant Church; a lot was donated to the Baptist Church; and a lot was donated to the Federation of Fly Fishermen. Twenty-five homes have been built on the property ranging from a low value of $75,000.00 to a high value of $200,-00.00 and the 26th home is now under construction in the Madison Addition.

A loan was obtained on October 26, 1984, by WRB–West Associates, Inc., and WRB–West Associates Joint Venture from Deseret Federal Savings and Loan Association of Salt Lake City, Utah in the principle sum of $4,200,000.00, secured by a first mortgage on all of the property.,

The Promissory Note of 4.2 million to Deseret was amended and restated in a first amended and restated Promissory Note dated March 29, 1985, and further amended pursuant to a second amendment to the Promissory Note dated April 29, 1986. This loan continued to be secured by first mortgage on the Madison Addition property.

It is reasonable to conclude from the Deseret Loan documents that it was the intent of the parties that lots would be released from the mortgage indebtedness as sales continued to occur in the ordinary course of business of WRB–West Associates, Inc. During the period from October 1984 until April, 1988, Walker individually paid down the indebtedness owed by WRB–West Associates, Inc., and WRB–West Associates Joint Venture to Deseret from the original principle balance of 4.2 million to the sum of 2.4 million dollars. Around this time, Walker disappeared and his whereabouts are still unknown. As a result of Walker's disappearance no further payments were made on the note to Deseret and the note went into default.

Robinson, who was the acting president of WRB–West Associates, Inc., attempted to negotiate a Revised Release Schedule with Deseret so that sales of property in the Madison Addition could continue. This renegotiation was necessary as Walker, in 1986, arbitrarily increased the prices of lots in the Madison Addition far beyond their market value and the release prices set forth in the amended mortgage were about the market value of the lots, which left nothing for operating capital for the business. Deseret indicated that they would favorably consider a renegotiation of the agreement so that sales could continue and payments could be made on the mortgage. However, at a meeting in Salt Lake City, in February 1989, Debtors learned that the Federal Deposit Insurance Corporation (FDIC) had assumed control of the operations of Deseret. The FDIC refused to discuss the matter at that time and requested a proposal from Robinson. Robinson submitted a proposal and made several requests through his attorney to Deseret to its attorney, in an attempt to obtain authorization so that WRB–West Associates, Inc., could proceed with sales of lots in the Madison Addition and continue making loan payments. Despite these requests, the only response received by Robinson or his attorney was that the matter was under consideration. As a result, WRB–West Associates, Inc., and WRB–West Associates Joint Venture filed for protection under Chapter 11 of the Bankruptcy Code on September 7, 1989.

It was subsequently discovered that on September 11, 1989, Deseret, through the FDIC, sold the loan, which had a principal balance of $2,470,262.51 and accrued interest of $570,930.60 for a total balance of $3,041,193.51 to MAILP for the discounted sum of $1,057,000.00, being a reduction of $1,994,567.00 below the value of the note. The value of the discounted note was fixed by an appraisal of the security by West Foster, discussed later.

Based on his knowledge in the investment field and his active working experience in the Madison Addition; the fact that it was sold as raw land for a value of 2.7 million; and, the prior 137 lot sales for $2,023,126.00 during the early stages of development, Robinson, as president of Debtors, now values the remaining 167 res-

idential lots at $3,000,000.00; the remaining duplex lots at $1,000,000.00 and the planned unit development lots at 8.9 million dollars for a total value of the subdivision of 12.9 million dollars, on a going concern basis.

In 1987, Deseret had the property appraised by West Foster, an M.A.I. Foster updated his appraisal in 1988. Foster's appraisal gave a fair market value of the development sold as a whole, as well as a fair market value of each lot and tract sold over a period of 12 years. His 1988 appraisal valued the development sold as a whole at $1,057,000.00, being the discount amount of the loan sold to MAILP. Foster's appraisal of the remaining single family lots sold individually was $2,304,500.00 and the planned unit development tract was $1,184,000.00, for a total value of $3,488,500.00. The Debtor has pointed out, however, that Foster's appraisal of the single family units may be somewhat below fair market value, based on proposed sales agreement, now void, but which are, according to Robinson and a realtor, subject to resurrection if clear title can be conveyed. The Debtors' evidence shows the following:

| PROPERTY | FOSTER APPRAISAL | BUY–SALE AGREEMENT | DIFFERENCE IN VALUATION |
|---|---|---|---|
| Lot 9, Blk 7 | $11,500.00 | $ 16,875.00 | $ 5,375.00 |
| Lot 22, Blk 3 | 19,500.00 | Both Lots | Both Lots |
| Lot 23, Blk 3 | 19,500.00 | 45,000.00 | 6,000.00 |
| ½ of Lot 7, Blk 2 | Entire Lot 11,000.00 | ½ Lot 12,000 whole lot 24,000 | Whole Lot 13,000.00 |
| ½ of Lot 7, Blk 2 | Entire Lot 11,000.00 | ½ Lot 12,000 whole lot 24,000 | Whole Lot 24,000 |
| Lot 6, Blk 2 | 11,000.00 | 23,000.00 | 12,000.00 |
| Totals | $83,500.00 | $132,875.00 | $49,375.00 |

Foster explained that his investigation revealed the properties subject to the Buy–Sell agremments were adjacent to existing dwellings, thereby tending to increase their market value. In any event, the value of the 167 single family residential lots and duplex lots range between $4,000,600.00 and $2,304,500.00, if sold over a period of five to six years. There is a significant difference on the fair market value of the planned unit development tract, ranging from 8.9 million dollars as the Debtors' value to Foster's value of $1,184,000.00. One factor which Foster believes affects the fair market value of these unsold lots is that re-sale of lots by existing owners is on going, and tends to depress the available market for the Debtors' properties. I conclude based on the testimony that the going concern valuation of the remaining tracts is $5,185,600.00, being significantly above the amount of the principal and accrued interest of the Deseret loan, and the discounted value of MAILP assignment. This fair market value figure is the total of the 167 residential lots valued at 3 milion dollars, the duplex lots valued at 1 million dollars and the planned unit development parcels valued at $1,185,600.00. MAILP concedes that the appropriate valuation concept to use is a going concern value, not a liquidated value of the remaining tracts sold as a whole. *See*, e.g. *In re Robinson Ranch, Inc.*, 75 B.R. 606 (Bank.Mont.1987); *In re Foster*, 79 B.R. 906, 907 (Bankr.Mont. 1987) (where the property will be held as a going concern for the production of income to pay reinstated mortgages and other debts, the value under 11 U.S.C. 506(a) should be based on a fair market going concern value, not a liquidating value).

Thus, we have before the Court a residential development unit where individual lots are sold to buyers on a nationwide basis. The very nature of the Debtors' business is to sell the developed, but unim-

proved lots, so that the ordinary course of Debtor's business is land sales. Since each sale produces cash which is subject to the MAILP and other mortgages, it is necessary that either MAILP consent to the use of the funds or, absent consent, the Debtors' obtain Court approval for the use of cash generated from the sales made in the ordinary course of business. MAILP has not consented. Consents have been filed by the second and third lienholders.

*Matter of Kain,* 86 B.R. 506, 511, 513 (Bankr.W.D.Mich.1988) addresses the issue in this manner.

"When a chapter 11 debtor-in possession is authorized to operate its business, it may use property of the estate in the ordinary course of business. [363(c)(1)]. However, a debtor-in-possession or trustee is *absolutely* prohibited from using cash collateral unless a secured creditor with an interest in such collateral consents or unless the court authorizes the use of cash collateral. [363(a)] and [363(c)(2)].

\*     \*     \*     \*     \*     \*

In a classic sense, adequate protection payments should be applied to compensate a secured creditor for any diminution in the value of collateral as a result of use, depreciation, destruction or other caused reduction in value. 11 U.S.C. § 361; 11 U.S.C. § 363(e); *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., (In re Timbers of Inwood Forest Assocs., Ltd.),* 793 F.2d 1380, 1412 n. 57 (5th Cir.1986) (collecting supporting cases), *aff'd, United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.,* [484] U.S. [365], 108 S.Ct. 626, 98 L.Ed.2d 740 (1988); *General Elec. Mortgage Corp. v. South Village, Inc. (In re South Village, Inc.),* 25 B.R. 987, 994 (Bkrtcy.D.Utah 1982) ('adequate protection was protection ... against depreciation of the collateral when it erodes the allowed secured claim.')."

On the issue of adequate protection required by § 363(d) and (e), *In re O'Connor,* 808 F.2d 1393, 1396 (10th Cir.1987) holds:

"[2, 3] In recognition of the powers created in bankruptcy law to adjust debts and creditors' interest, Congress realized the need to protect creditors from unfair treatment. Hence, it codified the concept of adequate protection into the several aggressive remedies available to debtors and bankruptcy trustees. *See 2 Collier on Bankruptcy* ¶ 361.01[1] (15th ed. 1979). The whole purpose in providing adequate protection for a creditor is to insure that the creditor receives the value for which the creditor bargained prebankruptcy. House Rep. No. 95–595, 95 Cong., 2d Sess. 53, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6295. In determining these values, the courts have considered 'adequate protection' a concept which is to be decided flexibly on the proverbial 'case-by-case' basis. *In re Martin,* 761 F.2d 472 (8th Cir.1985); *In re Monroe Park,* 17 B.R. 934 (D.C.Del.1982). Since 'value' is the linchpin of adequate protection, and since value is a function of many factual variables, it logically follows that adequate protection is a question of fact. *In re Martin,* 761 F.2d at 472; *In re George Ruggiere Chrysler–Plymouth, Inc.,* 727 F.2d 1017 (11th Cir.1984); *In re Bank Hapoalim B.M., Chicago Branch v. E.L.I., Ltd.,* 42 B.R. 376 (D.C.N.D.Ill. 1984); *Brookfield Production Credit Association v. Borron,* 36 B.R. 445 (D.C. E.D.Mo.1983), *aff'd,* 738 F.2d 951 (8th Cir.1984)."

*In re Mellor,* 734 F.2d 1396, 1400 (9th Cir.1984) addressed the issue on a basis of "equity cushion" as adequate protection in holding:

"While the term 'adequate protection' is not defined in the code, 11 U.S.C. § 361 sets forth three non-exclusive examples of what may constitute adequate protection: 1) periodic cash payments equivalent to decrease in value, 2) an additional or replacement lien on other property, or 3) other relief that provides the indubitable equivalent. *In re Curtis,* 9 B.R. 110, 111–112 (B.Ct.E.D.Penn.1981).

■ The Mellors contend that the sellers are adequately protected by an 'equity cushion'. Although the existence of

an equity cushion as a method of adequate protection is not specifically mentioned in § 361, it is the classic form of protection for a secured debt justifying the restraint of lien enforcement by a bankruptcy court. *In re Curtis,* 9 B.R. at 112. In fact, it has been held that the existence of an equity cushion, standing alone, can provide adequate protection. *In re San Clemente Estates,* 5 B.R. 605, 610 (B.Ct.S.D.Cal.1980); *In re Tucker,* 5 B.R. 180, 182 (B.Ct.S.D.N.Y.1980); 2 Collier of Bankruptcy, § 361.02[3] at 361–9; (15th ed. 1979). A sufficient equity cushion has been found to exist although not a single mortgage payment has been made. *In re Curtis,* 9 B.R. at 111."

See, also, *In re Kost,* 102 B.R. 829 (D.Wyo. 1989) for a collection of cases on the percentage of equity cushion as adequate protection. However, the equity cushion itself, as is present in this case, must be protected against erosion by accruing interest, depreciation or other changes. *In re Carson,* 34 B.R. 502 (D.Kan.1983). According to the general partners of MAILP, the interest accrues at the rate of $994.00 per day, which is the equivalent of $362,810.00 per annum.[2] If MAILP is either paid that amount from the sale of lots, or retains a sufficient equity cushion during reorganization, it is adequately protected under the above case holdings. Moreover, equity cushion constitutes adequate protection in this case because Deseret did not bargain for an income stream of payments from the lot sales. The loan was to be paid by Walker independent of sales proceeds. In its bargain, Deseret relied on the value of the collateral as security for its loan. *See,* e.g. *In re Triplett,* 87 B.R. 25 (Bankr.W.D. Tex.1988) (to say that the creditor expected to receive the income stream is not appropriate where the creditor has bargained for collateral of a value in excess of the amount of the debt).

The Debtor states it needs 25% of the sale price for operating expenses, promotion and real estate commissions. The balance, or about $13,500.00 from each sale, based on an $18,000.00 purchase price,

can be used to fund a plan of reorganization. During the administration of the estate, the sales must be allowed to continue, and that event can only occur if lien releases to each lot are filed of record as each sale is made. This was the agreement Deseret had with the Debtor.

Given the facts in this case, I conclude: (1) The Debtors' sale of remaining lots should continue unfettered in the ordinary course of its business, (2) MAILP is adequately protected by a substantial equity cushion of 40%, (3) upon sale of each lot, lien releases must be provided by each mortgage holder, including MAILP, (4) the Debtor needs an amount equal to 25% of each sale contract to sustain its operation, and (5) the balance of the funds shall be held in escrow at interest pending hearing on confirmation of Debtor's Chapter 11 Plan.

IT IS ORDERED the Debtor's Motion to sell residential lots is granted upon condition that (1) each lienholder shall execute and file a satisfaction of mortgager as each lot is sold for cash, (2) twenty five percent (25%) of the sales price of each lot shall be used by the Debtor for its operating expenses pursuant to a budget to be filed with this Court within ten (10) days of this Order, and (3) the balance of the proceeds shall be deposited in escrow at interest pending hearing on confirmation of Debtor's Chapter 11 plan of reorganization.

---

**2.** This computation is based on the amount of the principal and pre-petition interest of the

Deseret note. I give no opinion at this time as to the proper claim of MAILP.