**In re Larry COLEMAN, Anita Coleman, Wesley W. Coleman and Vivian Coleman, d/b/a Coleman Ranch, Debtors.**

**Larry COLEMAN, Anita Coleman, Wesley W. Coleman and Vivian Coleman, d/b/a Coleman Ranch, Plaintiffs,**

v.

**FARM CREDIT BANK OF SPOKANE, and Charles and Delores Bick, Defendants.**

**Charles and Delores BICK, Cross-claimants and Counterclaimants,**

v.

**FARM CREDIT BANK OF SPOKANE, Larry Coleman, Anita Coleman, Wesley W. Coleman and Vivian Coleman, d/b/a Coleman Ranch, Cross Defendants and Counterdefendants.**

**Bankruptcy No. 86–20140. Adv. No. 289/0018.**

United States Bankruptcy Court, D. Montana.

Aug. 23, 1989.

Harold V. Dye, Missoula, Mont., for debtors/plaintiffs.

W. Arthur Graham, Missoula, Mont., for defendant FICB.

Clinton J. Fischer, Polson, Mont., for defendants Bicks.

Dunlap & Caughlan, Butte, Mont., trustee.

### ORDER

JOHN L. PETERSON, Bankruptcy Judge.

This adversary proceeding was filed by Chapter 12 Debtors to specifically enforce the provisions of a confirmed Chapter 12 Plan against Farm Credit Services, formerly Federal Intermediate Credit Bank (FICB), concerning a Contract for Deed between the Debtors and Defendants Charles F. and Delores A. Bick. After answer, trial of the cause was held on May 2, 1989, and thereafter all parties filed memorandum of authorities in support of their respective positions.

On April 26, 1974, the Debtors entered into an agreement with Charles F. and Delores A. Bick, as sellers, for purchase of certain real property in Lake County, Montana, for the sum of $320,000.00. In 1986, the Debtors sought relief under Chapter 12 of the Bankruptcy Code and listed Bicks as secured creditors. After many procedural maneuvers, particularly involving the Defendant FICB, an Amended Chapter 12 Plan was confirmed by Order of this Court on May 3, 1988. The Plan, filed March 8, 1988, included the following pertinent provisions dealing with payment of the FICB debt and the Bick contract, to-wit:

> "2. In addition to the plan payments as set forth above, the Debtors shall transfer to FICB, on confirmation of the plan, all their right, title and interest in the 'Bick' and 'Cahoon' properties excluding Debtors farmstead and improvements including silage pit and contents and five acres on the Bick property.
>
> (a) The transfer of the real property shall be subject to existing encumbrances for taxes and the contract balance owing on the Bick property. The exact credit to Debtors' indebtedness to FICB depends on the date of confirmation of the plan. However, projecting a confirmation date of April 1, 1988, this would result in a credit of Two Hundred Twenty One Thousand Six Hundred Forty Three and 12/100 Dollars ($221,643.12) to the FICB indebtedness.
>
> (b) Debtors shall retain any right of first refusal to the deeded properties that may be provided by Montana law. Debtors are willing to negotiate in good faith with FICB to lease the Bick and Cahoon properties back on a cash basis.[1]

---

1. The original Complaint in Court II sought to enforce the lease back provisions. At trial, the Debtors dismissed Count II of the Complaint.

(c) On or before May 15, 1988, Debtors shall pay FICB from proceeds of their bull sale the sum of Two Hundred Fifteen Thousand and No/100 Dollars ($215,000.00).

(d) On or before October 15, 1988, the Debtors shall pay FICB the sum of Two Hundred Fifteen Thousand and No/100 Dollars ($215,000.00) from the proceeds of their sale of heifers and calves. Debtors project that they would retain a herd of at least 150 cows and bulls and their entire inventory of hogs.

\*    \*    \*    \*    \*    \*

4. *Treatment of Claim of Charles and Delores Bick.*

(a) Charles and Delores Bick are fully secured creditors and are owed approximately One Hundred Sixty–Four Thousand Five Hundred Fifty–One and 54/100 Dollars ($164,551.54) as of April 1, 1987. According to the Manicke appraisal, the property has a gross value of Three Hundred Twenty–Six Thousand and No/100 Dollars ($326,000.00).

(b) Debtors propose to divide the Bick contract into two contracts in proportion to the values established by Lee Manicke and his appraisal. Debtors propose to keep the farmstead improvements and five acres and deed the rest of the property to FICB who shall take the property subject to its proportionate share of indebtedness against the property. According to Mr. Manicke's appraisal, the farmstead improvements and five acres have an appraised value of Sixty–Nine Thousand Three Hundred Eighty–Six and No/100 Dollars ($69,386.00) or Twenty–One Percent (21%) of the total value of Three Hundred Twenty–Six Thousand and No/100 Dollars ($326,000.00) on the farmstead.

(c) Debtors therefore propose that they will retain Twenty–One Percent (21%) of the Bick lien of Thirty–Four Thousand Three Hundred Fifty–Five and 82/100 Dollars ($34,355.82). The remaining Seventy–Nine Percent (79%)

of the Bick lien will be attached to the property being deeded to FICB.

(d) Debtors shall pay Mr. and Mrs. Bick for the proportion of the property retained by them of Twenty–One Percent (21%) of the payments otherwise due on the property. Debtors retained ownership shall also serve as additional security for the property deeded to FICB until released by Mr. and Mrs. Bick.

(e) Except for the division of the contract into two separate liens in proportion to value, the claim of Bick shall be unimpaired under the plan."

FICB objected to the Plan, but after negotiations between the parties, they filed a "Stipulation As to Amount of Federal Intermediate Credit Bank Debt and Consent to Second Amended Chapter 12 Plan As Amended" which agreed to the amount of the FICB claim at $956,430.17, changed the Debtors Plan payment date from April 1, to May 1, and agreed to the reduction of the FICB debt by including the credit of $221,-643.18 from "real estate transferred back" and other cash payments, so that the debt by October 15, 1988, would be $241,103.29, which was to be paid over 19 years at annual payments of $27,405.02. The Stipulation further provided:

"6. Debtors shall obtain a proper survey and record a Certificate of Survey on two parcels of property which they intend to keep from the 'Bick property'. The two surveys will survey out one parcel including the homestead and other buildings and a second parcel incorporating the silage pit. The two parcels together will not exceed five acres in size. Debtors shall bear all expenses of obtaining such surveys and recording the appropriate Certificate of Survey."

According to Debtor Larry Coleman, the acreage to be retained from the Bick contract is where the family farmstead is located, including the family home, ranch and out buildings, and silage storage, so that such portion of the retained farm was essential to raising the hogs, which revenues are necessary to fund the future Plan pay-

ments. The two surveys were completed by the end of July, 1988, and delivered to FICB, but included acreage which totaled 6.72 net acres.

The Order of Confirmation adopted the amendments made to the Plan by the FICB Stipulation. Under the Bick contract, payment of the 1988 installment was due May 1, 1988, a fact known to FICB when it executed the consent to the Plan. The Debtors paid the Bick escrow payment on May 16, 1988, in the amount of $3,406.66, being 21% of the payment due May 1. FICB never made any payment to Bick. On May 31, 1988, FICB served upon the Debtors a "Notice of Termination of Interest and Notice to Quit" possession of the Cahoon and Bick properties, stating in part:

"All rights you formerly held to the property have expired by reason of the Order Confirming Chapter 12 Plan, entered by the Honorable John L. Peterson on May 3, 1988, in bankruptcy proceeding No. 86–20140."

Possession of the property was demanded, as well as all keys to buildings. Consequences of holdover were likewise described in the notice.

On June 3, 1988, Bick filed a Consent to Chapter 12 Plan, which was the first formal appearance Bicks made in the bankruptcy case. Mr. Bick explained, however, that, having received notices of the bankruptcy since 1986, and having been paid each year on the contract by the Debtors, and having been told by the Debtors' counsel in the spring of 1988 that the contract would only be divided between the Debtors and Land Bank so that the contract would not be impaired and he would receive payment, he did not object to the Debtors' Plan. When the FICB payment was not made by May 26, 1988, he consulted counsel, which sent the Consent to the Plan to the Court for filing. Bick understood that the contract payments would remain unchanged and all of the land included in the contract, including the portion of five acres to be reserved to the Debtors, would be collateral for the payment of the Bick claim. On June 7, 1988, Bick served on FICB a "Notice of Default of Contract", stating in part:

"* * * wherein you (FICB) assumed responsibility for a seventy-nine percent (79%) interest in said Contract for Deed by Stipulation filed in United States Bankruptcy Court For the District of Montana, case 86–20140 regarding Debtors' Second Amended Chapter 12 Plan dated the 29th day of April, 1988.

You are in default under the terms of the above-noted Contract for Deed in the following particulars:

Failure to make your share of the May 1, 1988, payment in the sum of Nine Thousand Four Hundred Eight and $^{87}/_{100}$ths Dollars."

The notice gave FICB 30 days to cure the default in payment, or the balance would accelerate in the following 60 days. FICB response on July 12, 1988, was that the transfer of property to FICB from the Debtors had not yet taken place because the survey had not been completed, and FICB cannot make any "payments under the Contract until such time as we have received a transfer of title from Colemans". The response further alerted Bicks that if Bicks felt it necessary to pursue the default, FICB would seek protection from the Bankruptcy Court or require a mortgage foreclosure. The letter then told Bicks FICB did not assume any liability or responsibility to Bicks, but rather the Plan "calls for a transfer of interest subject to liabilities to The Federal Intermediate Credit Bank of Spokane", so that "there is no obligation of The Federal Intermediate Credit Bank to Mr. and Mrs. Bicks". By that statement, the FICB raised the issue at controversy in this adversary proceeding. Thereafter, in August, 1988, FICB elected not to make any payments on the Bick contract, and tendered to the Debtors, and later to Bicks in April, 1989, a Quitclaim Deed of its interest in the Bick real property. Both parties rejected such tender, and now the Debtors in this action seek to hold FICB liable under the Plan for the 79% payment due on the unpaid portion of the Bick contract.

Not only does FICB contend in defense that the Plan does not require it to make such contract payments, but FICB also

claims as a defense that the Debtors are in default of the Plan regarding the survey, which exceeded five acres, and failure to make the October, 1988, Plan payment of $215,000.00 in full. The evidence shows the Debtors prepaid on June 15, 1988, the sum of $100,000.00 to FICB as part payment of the October installment. The Debtors testified that after FICB refused to make payment on the Bick contract, that the Plan became impossible to perform, because the five plus acres of land essential to the farming operation was subject to loss to Bick by reason of the default of non-payment of the May, 1988, installment by FICB. As Larry Coleman stated:

"When you (FICB) decided to walk away from it (Bick payment), if we felt we had to pick that up, it made a lot of difference."

The financial impact to the Debtors was obviously exacerbated, because not only did the Debtors not have the Bick property to farm, which was worth $150,000.00 in crops, but they did not have the cash flow available to make the FICB portion of the Bick payment and also make the other payments under the Plan. It is clear from the Plan that the payments due under the Plan to the Trustee of $45,950.67 beginning April 1, 1989, does not include the installment payment on the Bick contract. In the schedule of payments introduced by FICB the Bick payment in 1989 of $8,600.00 was to be paid directly to the escrow in addition to the Trustee's payment, which is true for each year of the Plan. FICB had such schedule available to it since shortly after March 18, 1988, and before the Stipulation of April 29, 1988. I find each of the above to be the facts of this case from the evidence. I reject FICB's contention that the balance due on the October, 1988, payment was not made because of disastrous tax consequences which would be incurred by the Debtors upon sale of cattle. The balance of the payment would have come from crops, hogs or cattle, or a combination of all three, but FICB's interpretation of the

Plan placed Debtors in a tenuous cash position and jeopardized the confirmed Plan so that Debtors were placed in a position of bringing this proceeding rather than capitulating to FICB's interpretation of the Plan.

I conclude from the provisions of the confirmed Plan, which incorporated the Stipulation between FICB and the Debtors, that the FICB became obligated under the Plan to pay 79% of the unpaid balance of the Bick contract in consideration of transfer of the major portion of the Bick land to FICB. FICB defaulted on such payment. The Plan is not ambiguous when one considers its terms in the context of the Bankruptcy Code. The partial satisfaction of the FICB debt was to be made by the transfer of the Bick and Cahoon real property, excluding five acres of farmstead, subject to survey. FICB lays great stress on the language under Paragraph 2(a) that the transfers of the real property "shall be subject to existing encumbrances for taxes and the contract balance owing on the Bick property".[2] Under the FICB theory, it did not assume to pay the contract balance, as there is no specific reference to such condition of payment by FICB in the Plan. FICB argues that the term "subject to" is conclusive. FICB cites *Miller v. DeGraffenried*, 43 Colo. 306, 95 P. 941, 942 (1908), *Parker v. Rexall Drug Company*, 12 Ga. App. 32, 207 S.E.2d 617, 618, (1974) and *Cassidy v. Bonitatibus*, 5 Ct.App. 240, 497 A.2d 1018 (1985), in support of its contention that the term "subject to" does not suggest an agreement to assume the obligation to make payments. None of these cases involved a Chapter 12 case. In *Cassidy*, for example, there was a written agreement between the parties for the purchase of real property, whereby the defendant buyers would take the property "subject to—a prior mortgage as of record appears". The Connecticut Appellate Court held:

"Unless the grantee has agreed to assume an existing mortgage debt, the mere taking of title to the mortgaged

---

**2.** Subparagraph 4(b) reads that the Debtors shall deed all but five acres to FICB "who shall take the property subject to its proportionate

share of indebtedness against the property". This provision can easily be construed that FICB would pay its share of the debt.

property imposes no personal liability on the grantee to satisfy the debt, and the obligation to pay remains that of the mortgagor alone. (Citing cases)."

I have no quarrel with such statement of law,[3] except to note it is inapposite to the facts in this case. Indeed, *Cassidy* further holds that to hold the grantee liable "[T]here must be a clear showing of mutual assent before liability for a preexisting mortgage debt may be imposed upon a grantee of the mortgaged premises". *Id.* at 1019.

In the case *sub judice*, FICB has completely disregarded the language of the Plan as it affects the Bick contract, and to which it assented.

FICB certainly is not a stranger to Chapter 12 reorganizations under the Bankruptcy Code. Indeed, the legislative history of Chapter 12 indicates that Federal Land Banks and Production Credit Associations were singled out as substantial farm creditors on a national basis. Senator Grassely, a leading proponent of Chapter 12 legislation, stated in the debate on S.2249 and the family farm amendments to that bill:

"Unfortunately, farm debtors are often in the anomalous position of having too few unsecured debts, because they keep their trade creditors fairly current. The largest unsecured claim is often held by the land bank or PCA as part of their overall claim, which is only partially secured because of fall in land values. When these creditors will not go along with the plan, they can force liquidation." 132 Cong. Rec. S.5556 (daily ed. May 7, 1986) (statement of Senator Grassely).

Accordingly, Chapter 12 was fashioned to provide a vehicle for repayment of debt out of future income. *In re Danelson*, 77 B.R. 261, 263–264 (Bankr.Mont.1987), discussing Chapter 12 requirements, held:

"A few principles of Chapter 12 should be examined. The plan must contain three distinct provisions:

1. The debtor shall turn over to the trustee all future earnings to the ex-

tent such income is required to carry out the debtor's plan.

    *    *    *    *    *    *

2. The plan must provide for full payment in deferred cash payments, of all section 507 priority claims, unless the creditor and debtor agree to some other treatment of such claims.

    *    *    *    *    *    *

3. If the plan classifies claims, it must treat each claim within the class the same, unless the creditor in such class consents to less favorable treatment. 11 U.S.C. § 1222(a)(3).

    *    *    *    *    *    *

In order to confirm a Chapter 12 plan, the requirements are set forth in section 1225.

    *    *    *    *    *    *

Under § 1225(a)(5), each allowed secured class under the plan must either have accepted the plan, or the plan must provide that each secured claimant will retain a lien on collateral securing the claim, and as of the effective date of the plan, that claimant receives in value an amount not less than the allowed amount of the claim. A third alternative is for the debtors to surrender the collateral securing the claim to the creditor. * * * "

Chapter 12 was thus passed by the Congress in 1986 as a vehicle to salvage the finances of family farmers.

"It is designed to give family farmers facing bankruptcy a fighting chance to reorganize their debts and keep their land." 132 Cong. Rec. H.8999 (daily ed. Oct. 2, 1986).

█ The effect of confirmation of a Chapter 12 Plan is governed by § 1227 of the Code, which reads:

"(a) Except as provided in section 1228(a) of this title, the provisions of a confirmed plan bind the debtor, each creditor, each equity security holder, and each general partner in the debtor,

---

**3.** *Helvering v. Southwest Consolidated Corp.,* 315 U.S. 194, 200, 62 S.Ct. 546, 550, 86 L.Ed. 789 (1942), states the general rule that "the words

'subject to' normally connote, in legal parlance, an absence of personal obligation".

whether or not the claim of such creditor, such equity security holder, or such general partner in the debtor is provided for by the plan, and whether or not such creditor, such equity security holder, or such general partner in the debtor has objected to, has accepted, or has rejected the plan.

(b) Except as other wise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor.

(c) Except as provided in section 1228(a) of this title and except as otherwise provided in the plan or in the order confirming the plan, the property vesting in the debtor under subsection (b) of this section is free and clear of any claim or interest of any creditor provided for by the plan."

Since 1227 specifically states the provisions of the confirmed Plan bind the parties. The language of *In re Herron*, 60 B.R. 82, 84 (Bankr.W.D.La.1986), is particularly appropriate to the present case.

"Once a plan is confirmed, the preconfirmation debt is 'replaced' with a new indebtedness as provided in the confirmed plan. The new indebtedness is in essence a new and binding contract between the Debtor and the creditors. Upon confirmation the Debtor is free to conduct business and, as a consequence, is similarly liable for post-confirmation obligations and conduct."

It is clear, therefore, each party to the Plan is bound by its provisions.

■ When the Plan was confirmed, FICB was directly thrown into and made a party to the Bick Contract for Deed. FICB recognized such fact in its consent, and the Plan language is unambiguous in this regard. Moreover, FICB after confirmation, issued a notice to the Debtors to surrender possession of the Bick property to FICB, which is consistent with its letter of July 12, 1988, that payment was being delayed because transfer of title had not yet occurred. Where FCIB goes off track is in its failure to reconcile Paragraph 2(b) of the Plan with Paragraph 4, treatment of

Bick's secured claim. Not only is the percentage division of the Bick contract outlined at 79%–21%, the entire lien is preserved in Bick to both parcels. More important, however, is subparagraph (e) which unequivocally states "the claim of Bick shall be unimpaired under the plan". FCIB agreed to such provision. The term "unimpaired" has special legal meaning in the bankruptcy sense and is peculiar to a Chapter 11 case. § 1124. However, Subsections (b) through (g) and (i) of Section 103 make the provisions of Chapter 7, 9, 11 and 13 inapplicable to cases under Chapter 12. But in this case, the parties borrowed such term of art and included it in the consensual plan. As a result, the meaning of the term "unimpaired" in subparagraph (e) is important to understand not only as to the intent of the parties but the effect of the Plan on the Bick contract. *In re Acequia*, 787 F.2d 1352, 1363 (9th Cir.1986), explains the term impairment:

"a. *Impairment*

11 U.S.C. § 1124(1) provides that an interest is impaired *unless* the plan 'leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest'. The focus of the impairment provision is different from that of § 1123(a)(4), considered previously. The equality of treatment provision of § 1123(a)(4) requires a comparison of all the interests similarly classified to determine whether there is any inequality in treatment among those interests. The impairment provision of § 1124(1) requires an examination of each interest to determine whether the plan alters the legal, equitable, or contractual rights of the holder of that interest."

As applied to Bick, the Debtors and FICB agreed to a confirmed Plan which, except for the division of the contract into two separate liens divided 79% and 21%, provided Bicks' claim would not be altered as to payment. In other words, the contract would not be altered as to amount or term of payment, so that the contract was thus unimpaired. Since FICB had full knowledge of the Bick payment provisions, it

agreed to make 79% of the Bick contract balance in return for which it received land of an equivalent value. I am buttressed in this holding not only by the language of the *Cassidy* case, supra at 1019, (mutual assent to assume personal liability may be shown) but by well established contract law, acknowledged by FICB in its memorandum, that the whole of the contract is to be taken together so as to give effect to every part if reasonably practicable, each clause helping to interpret the other. *See, e.g.,* Sec. 28–3–202, Mont.Code Ann. I hold FICB is thus liable for 79% of the Bick contract balance and is in default of each installment payment. Because the Plan binds Bicks as well as FICB, I hold Notice of Default which accelerated the unpaid balance is void as long as FICB, consistent with this order, cures the payment of installments.

■ FICB maintains an alternative position however. It argues that even assuming arguendo that one imposes upon FICB the obligation to pay Bick, FICB is exonerated from that payment under the remedy provided in Section 27–1–421, Mont.Code Ann., which reads:

"Whenever an obligation in respect to real property would be specifically enforced against a particular person, it may be in like manner enforced against any other person claiming under him by a title created subsequently to the obligation except a purchaser or encumbrancer in good faith and for value, and except that any such person may exonerate himself by conveying all his estate to the person entitled to enforce the obligation." [4]

The argument is misplaced. This Court does not look to Montana statutory law dealing with actions for specific performance and their remedies to determine the rights and remedies of the parties under a Chapter 12 confirmed Plan. State law, where repugnant to the federal provisions of Chapter 12, are inapplicable and unenforceable. Application of § 27–1–421

would provide a remedy inconsistent with the Debtors' rights and obligations under the Chapter 12 Plan. *In re Pelter,* 64 B.R. 492, 494 (Bankr.W.D.Okla.1986), holds:

"The Supremacy Clause prevents a state from enacting bankruptcy legislation that conflicts with an area acted upon by Congress. Where both Congress and a state assert power on the same area the state legislation is suspended to the extent it frustrates or burdens the federal purpose. *Jones v. Rath Packing Co.,* 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977); *Texaco, Inc. v. Liberty National Bank & Trust Co. of Okla. City,* 464 F.2d 389 (10th Cir.1972); *In re George Rodman, Inc.,* 50 B.R. 313 (Bankr.W.D.Okla.1985)."

*See, also, Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 208–209, 105 S.Ct. 1904, 1909–1910, 85 L.Ed.2d 206 (1985), holding the question of whether state action is preempted by federal law is one of Congressional intent, for the purpose of Congress is the ultimate tombstone. 5 *Collier on Bankruptcy,* ¶ 1227.01, pp. 1227–1 to 4 (15th Ed.), states:

" * * * The binding effect of section 1227(a) operates whether or not the claim of such creditor, equity security holder or partner is provided for by the plan and whether or not any of these persons objects to, accepts or rejects the plan. Further, the Order of Confirmation is *res judicata* and its terms are not subject to collateral attack. * * * When a debtor elects to turn over all or a portion of his future earnings to the Chapter 12 trustee for distribution to creditors, those earnings are subject to the control and supervision of an appointed administrator. In the opposing situation, when the debtor proposes to make substantial payments to certain creditors outside the plan, the court may want to expressly note its continuing jurisdiction over the debtor's future earnings in order to enforce compliance with the plan.

* * * * * *

---

**4.** A careful reading of this section reveals that it applies only to assignees of contract buyers. FICB in this case is not an assignee of the Debtors, but in fact is a purchaser of portion of the Bick Contract for Deed as substituted buyer. From this reasoning, Sec. 27–1–421 has no factual application to this case.

* * *, the legislative history to Section 1227 emphasizes that property that has revested in Chapter 12 debtors is available to them to secure post-confirmation financing of their farming operations.

\* \* \* \* \* \*

Congress' intent is made even more clear when this section is read in conjunction with Section 1225(b), which allows the debtor to retain sufficient funds necessary to the running of the debtor's farming operation."

Stated differently, this Court, the creditors and Debtors need look no further than to apply § 1227 and the terms of the confirmed Plan. The application of § 27–1–421 runs directly contrary to the Plan provisions which are given express effect under § 1227. For example, the Debtors must retain part of the Bick place to run the family operation and conduct its hog operation. Failure of FICB to pay Bick would place this acreage back into Bick upon default of any part of the contract payment, and frustrate the Debtors' reorganization. It is for this reason that state law, and particularly § 27–1–421, M.C.A., is not available in this case to FICB to force an inconsistent remedy on the Debtors and Bicks. The Court must look to the Plan to adjust the equities and rights between the parties. Under the Plan, FICB agreed Bicks would be paid in deferred cash payments, not receive the farm or a portion thereof, on voluntary reconveyance as allowed by § 27–1–421. The Plan is *res judicata* to all parties, and remedy urged by FICB under § 27–1–421 is totally inconsistent with the remedy afforded the Debtors under the confirmed Plan, to which FICB consented.

In order that all parties are treated according to the Plan provisions, the Debtors likewise must bring themselves in compliance with the Plan by making the agreed payment and transferring the Bick real estate to FICB. The survey must also be corrected. Because I have concluded FICB was erroneous in its legal interpretation of the Plan, I hold the payment to FICB due October, 1988, shall be without interest.

IT IS ORDERED Defendant FICB, now Farm Credit Services, shall pay over to Charles F. and Delores A. Bick with interest at 7% per annum a sum equal to 79% of the installments due on the contract payments for the years 1988 and 1989, and continue with such payments until the contract is paid in full, or further order of this Court relieves that obligation.

IT IS FURTHER ORDERED the Debtors shall within 15 days of this Order cure any default of payment due on October 15, 1988, and convey to Defendant FICB that portion of the Bick real property not subject to the survey of July, 1988, which shall be reduced in size to not more than five acres.