**In re Larry R. ADAM and Mary Lou Adam, Debtors.**

**Bankruptcy No. 88–09282.**

United States Bankruptcy Court, E.D. Michigan, N.D.

Nov. 18, 1988.

Cubitt, Cubitt & Trowhill, Bad Axe, Mich., for debtors.

Mark W. Hafeli, Bloomfield Hills, Mich., for First of America Bank.

Rozanne M. Giunta, Bay City, Mich., for Elkton Co-op. Farm Produce Co.

Thomas W. McDonald, Jr., Saginaw, Mich., Chapter 12 Trustee.

## MEMORANDUM OPINION RE: CONFIRMATION OF CHAPTER 12 PLAN

ARTHUR J. SPECTOR, Bankruptcy Judge.

On April 11, 1988, Larry Adam and Mary Lou Adam, his wife, filed a joint petition for relief under Chapter 12 of the Bankruptcy Code for their hog and crop farming operation. The debtors are eligible for Chapter 12 relief. They filed their first plan of reorganization on July 11, 1988 which was subsequently and repeatedly modified. First of America Bank–Thumb Area has objected to the debtors' plan in each of its variations. For purposes of this opinion, the only remaining objections are as follows:

1. Because the debtors assume that the bank's security interest does not cover the approximately 11,159 bushels of corn stored at the Elkton Co-op Elevator, their plan proposes to pay the bank too little on account of its secured claim, and therefore does not satisfy 11 U.S.C. § 1225(a)(5);

2. Because of the allegedly unreasonable delay in repayment of the bank's secured claim, in light of the propensity of the bank's collateral to depreciate with use and time, the plan does not adequately protect the bank's secured claim and therefore does not satisfy 11 U.S.C. § 1225(a)(5);

3. The debtors will be unable to make all of the payments under the plan and to comply with the plan, and so the plan does not satisfy 11 U.S.C. § 1225(a)(6).

### IS THE STORED CORN "FARM PRODUCTS"?

The first issue is strictly a Uniform Commercial Code Article 9 question. The facts are straightforward and not in dispute. The debtors are primarily crop farmers, raising wheat, corn, navy beans, and sugar beets. In addition, they also raise hogs. On January 5, 1988, Larry Adam entered into a grain bank arrangement with the Elkton Co-op Elevator. Under this arrangement, the elevator purchased 23,000 bushels of corn, which Mr. Adam was authorized to withdraw in order to feed his hogs; Mr. Adam signed a promissory note in favor of the elevator as "payment". The corn in the elevator was not grown by Mr. Adam nor did he ever possess it. Instead, he received a grain bank warehouse receipt which authorized him to withdraw that amount of corn from the elevator. By the time the bankruptcy was filed, there remained 11,159 bushels of corn still at the elevator. On March 28, 1985, the bank obtained from Larry Adam a security interest in farm machinery, accounts, instruments, general intangibles and proceeds; crops, both growing and harvested, and farm supplies. The bank perfected the security interest in machinery, growing and harvested crops and farm supplies by filing a financing statement with the Huron County Register of Deeds. No financing statement was ever filed at the Secretary of State to perfect the security interest in inventory, instruments or general intangibles. The bank claims that its perfected security interest on harvested crops covers the 11,159 bushels of corn presently stored at the elevator, because it is an interest in "farm products".

We agree with the debtors and the Elkton Co-op Elevator that the bank's security interest never attached to the corn stored at the elevator. The controlling statutory provision as to whether this corn is a farm product is Mich. Comp. Laws § 440.9109(3); Mich. Stat. Ann. § 19.9109(3).[1] It provides, in pertinent part, as follows:

> Goods are ... (3) "farm products" if they are crops or livestock or supplies used or produced in farming operations or if they are products of crops or livestock in their unmanufactured states ..., and if they are in the possession of a debtor engaged

1. All references to sections of the Michigan Uniform Commercial Code will hereafter appear in the following manner: § __-____.

in raising, fattening, grazing or other farming operations. If goods are farm products, they are neither equipment nor inventory....

It is not questioned that this corn constitutes "crops ... used or produced in farming operations". The question is whether the corn is "in the possession of a debtor engaged in raising, fattening, grazing or other farming operations." If the corn is deemed to be in the debtors' "constructive possession" and if constructive possession suffices for purposes of § 9–109(3), then the corn constitutes "farm products" and the bank's security interest extends to it. The parties cited these three cases as the controlling authority: *In re Roberts*, 38 B.R. 128 (Bankr. D.Kan.1984); *In re Nave*, 68 B.R. 139 (Bankr. S.D. Ohio 1986) and *In re Walkington*, 62 B.R. 989 (Bankr.W.D. Mich.1986). However, we believe that none of these cases control.

In *Roberts*, the bank had a security interest in "farm products". There, the wheat was grown and harvested by the debtors and was stored by the debtors at an elevator. Thereafter, the bankruptcy was filed. The bankruptcy court held that when grain has been owned and stored by a farmer, and when the warehouse receipt for the grain is still in the farmer's possession, that grain is "possessed" by the farmer, and therefore, a "farm product" within the meaning of § 9–109(3) of the Uniform Commercial Code. The reasoning was that the Uniform Commercial Code did not contemplate that grain would lose its farm product status when it is stored by a farmer producer that still owned the grain. The court in *Nave* followed this holding but the court in *Walkington* rejected it, holding that

once the grain is stored it ceases to be a farm product and becomes "inventory" as defined by § 9–109(4). However, *Walkington* did agree with the other courts that once a creditor has a perfected security interest in farm products, the farmer's act of storing the harvested crops cannot defeat the creditor's lien. The fact situations in each of these three cases were entirely different from those at bench.

In all three cases above, the debtors were the producers of the crop in question. In all three cases, at some point, the lender had a valid security interest when the crops were harvested by the farmer.[2] In the instant case, the debtors never grew nor actually possessed the corn in question. Thus, the rationale of *Roberts*, *Nave* and *Walkington* has no application to this case. The conflict apparent between *Walkington*[3] on the one hand and *Roberts* and *Nave*[4] on the other, with respect to whether crops harvested by a debtor become "inventory" when stored by the farmer in an elevator or retain their character as "farm products" is academic in this case. We hold that since the 11,159 bushels of corn were never in the possession of the debtors, they were never farm products as defined by § 9–109(3) of the Michigan Uniform Commercial Code with respect to the bank's security interest. The collateral in question may be inventory, as defined by § 9–109(4).

Alternatively, if the collateral is really not the actual corn in storage at all, because it is a fungible commodity and not identified to the debtor's contract, but is instead the warehouse receipt itself, then the collateral is a "document", as defined by U.C.C. § 1–201(15); § 9–105(1)(f). If it

---

**2.** In *In re Walkington*, 62 B.R. 989 (Bankr. W.D. Mich.1986) it was *assumed* that the creditor had a perfected security interest in farm products before the debtor placed the grain in storage. The court made this assumption because it was required to view the facts most favorably to the creditor, as the question arose in the context of the trustee's motion for summary judgment.

**3.** The following cases are in accord with the view stated in *Walkington: First Bank of North Dakota, N.A.–Jamestown v. Pillsbury Co.*, 801 F.2d 1036 (8th Cir.1986); 2 U.C.C. Rep. Serv.2d 333 (8th Cir.1986); *United States v. Progressive*

*Farmers Marketing Agency*, 788 F.2d 1327, 1 U.C.C. Rep. Serv.2d 1 (8th Cir.1986); *United States v. Hext*, 444 F.2d 804; 9 U.C.C. Rep. Serv. 321 (5th Cir.1971); *Garden City PCA v. International Cattle Systems*, 32 U.C.C. Rep. Serv. 1207 (D.Kan.1981); *In re Tinsley & Groom*, 49 B.R. 85 (Bankr. W.D.Ky.1984).

**4.** *Albion National Bank v. Farmers Cooperative Ass'n*, 228 Neb. 258, 422 N.W.2d 86, 6 U.C.C. Rep. Serv.2d 906 (1988) is in accord with the holding that collateral does not lose its character as a farm product when the farmer producer stored it in a commercial storage facility.

is inventory, a financing statement filed in the county Register of Deeds does not perfect the security interest. § 9–401(1)(c). If the collateral takes the form of a document, then there is a question whether the bank's security interest even covers it, as "documents" is not among the types of collateral listed in the security agreement. Even if it is included within the security agreement, the security interest in this particular document is not perfected. Section 9–304(3) provides:

A security interest in goods in the possession of a bailee other than one who has issued a negotiable document therefor is perfected by issuance of a document in the name of the security party or by the bailee's receipt of notification of the secured party's interest or by filing as to the goods.

It is undisputed that the non-negotiable warehouse receipt evidencing the grain bank transaction does not bear the bank's name and that the elevator did not receive notification of the bank's interest. Furthermore, the bank "filed as to the goods," i.e., the corn, only if the corn was a farm product, which we have already determined it was not. Therefore, there is no reason to determine what the nature of the collateral *is;* it is sufficient for these purposes to say that it is *not* farm products. *Garden City Production Credit Ass'n v. International Cattle Systems,* 32 U.C.C. Rep. Serv. 1207 (D.Kan.1981). Accordingly, the bank's objection to the confirmation of the debtors' Chapter 12 plan on these grounds will be denied.

## DOES THE PLAN PROVIDE ADEQUATE PROTECTION FOR THE BANK'S SECURED CLAIM?

The bank argues that the plan ought not be confirmed because it does not provide for the adequate protection of its secured claim during the term of the repayment period stated therein. Although nowhere in the confirmation standards enunciated in 11 U.S.C. § 1225 is there an explicit requirement that the plan "adequately protect" the secured claim, it is generally accepted that the reorganization chapters include the concept of indubitable

equivalence first enunciated by Judge Learned Hand in *In re Murel Holding Corp.,* 75 F.2d 941, 942 (2nd Cir.1935):

It is plain that "adequate protection" must be completely compensatory; and that payment ten years hence is not generally the equivalent of payment now. Interest is indeed the common measure of the difference, but a creditor who fears the safety of his principal will scarcely be content with that; he wishes to get his money or at least the property. We see no reason to suppose that the statute was intended to deprive him of that in the interest of junior holders, unless by a substitute of the most indubitable equivalence.

The requirement of adequate protection can also be implied from the penumbra of the two subsections, § 1225(a)(5) and (a)(6), read together. Under subsection (a)(5), a plan must provide, in theory, for the payment of the value of the amount of the secured claim, while subsection (a)(6) requires the court to find, in fact, that the debtor will be able to perform that promise.

The bank's argument here is that its collateral, consisting of farm real estate and farm machinery will depreciate over time and that the annual payments called for by the plan will not cover this depreciation. The bank has a claim in the amount of $201,362.30, which is secured by a real estate mortgage on 60 acres of farmland and the debtors' home and other farm buildings worth an equity to the bank of $117,362.30 and farm machinery with an equity to the bank in the amount of $84,-000. Although the various notes are cross-collateralized, the plan, as last revised, separates the bank's secured claims into two separate classes: Class 10 for the "real estate" notes and Class 11 for the machinery notes. The plan provides that the "real estate" claim of $117,362.30 would be paid with annual interest of 11% as follows: a principal payment on April 15, 1989 of $2,200 plus accrued interest from the date the plan is confirmed to April 15, 1989; thereafter, the remaining principal balance of $115,162 would be amortized over 15 years with annual payments of $16,015.60,

commencing on April 15, 1990 and on each April 15th thereafter until paid in full. The notes which were collateralized originally by farm machinery would be repaid by payment of $5,000 principal on April 15, 1989 and accrued interest at 11% per annum from the date of confirmation to said date; thereafter, the remaining principal balance of $79,000 would be amortized over nine years at 11% per annum with annual payment commencing April 15, 1990 in the amount of $14,268.00.

The bank complains that nine years to repay a loan secured by farm machinery, especially farm machinery as old as the debtors' in this case is unreasonably long and is designed in such a way as to not adequately protect its secured claim throughout the life of the repayment obligation. In theory, this objection appears sound. However, because of the remaining provisions of the plan and the facts of this case, we find that the objection is not well taken.

The debtors' plan also proposes to pay $9,000 in April, 1989 to companies which hold security interests on the farm machinery which are prior to the bank's. Therefore, the debtor correctly argues that the plan provides an immediate increase in the bank's equity position of $9,000. In addition, the plan proposes that the debtors pay off all past-due real property taxes which are currently prior liens to the bank's mortgage. This $8,600 would therefore create a corresponding addition to the bank's equity position. Accordingly, the debtors correctly argue that five months from now they will be improving the bank's equity position in their collateral by $17,600, without even considering the payments to be made to the bank. The plan proposes a $5,000 principal payment on the machinery notes and a $2,200 principal payment on the real estate notes in April, 1989. Thus, when all is totaled, the bank will be receiving a benefit of $24,800 in April, 1989, assuming the plan is confirmed. This is better than a 12% improvement in the bank's position.

The plan also proposes that the debtors continue their program of excellently maintaining their aging farm equipment and that the debtor replace farm equipment in each year of the plan. The budget proposes that $2,000 be spent before the 1989 crops are planted to replace the tires on one tractor, and that an additional $11,000 be expended in each of 1989 and 1990 for replacing other aged equipment. It is also important to remember that the majority of the bank's collateral is made up of real estate which is unlikely to depreciate markedly over this payment period. Based on all of the foregoing, we hold that if the plan is otherwise feasible, these provisions for replacement and repair, in light of the principal payments to the bank and other creditors adequately protects the bank's secured claim throughout the pendency of the repayment period notwithstanding the obvious depreciation which the farm machinery must suffer.

## WILL THE DEBTORS BE ABLE TO MAKE ALL PAYMENTS UNDER THE PLAN AND TO COMPLY WITH THE PLAN?

■ The debtor has the burden of proof to establish each of the elements for confirmation of the Chapter 12 plan. This includes, of course, that the debtor will be able to make all payments under the plan and to comply with the plan, as required by 11 U.S.C. § 1225(a)(6). *In re Crowley*, 85 B.R. 76 (W.D.Wis.1988); *In re Snider Farms, Inc.*, 83 B.R. 977, 986 (Bankr. N.D. Ind.1988); *In re Eber–Acres Farm*, 82 B.R. 889 (Bankr. S.D.Ohio 1987); *In re Martin*, 78 B.R. 593 (Bankr. D.Mont.1987).

Larry Adam testified on September 30, 1988 in support of confirmation of the version of his and his wife's Chapter 12 plan which was filed on August 26, 1988. The direct examination by the debtors' counsel yielded no information about the underlying assumptions upon which the debtors projected gross farm income of over $170,-000 each year of the plan. Through cross-examination by the bank's counsel it became apparent that Mr. Adam had made conflicting statements at various times about prices he had or could expect to attain for his crops, especially his predominant crop, sugar beets. Mr. Adam also

failed to bring to court with him any of the records which he needed to assist him in answering the relevant questions on material issues which were posed by the bank's counsel. The Court, therefore, halted the proofs and gave the debtors an opportunity to better prepare their proofs on feasibility.

The confirmation hearing re-commenced on November 7, 1988. Mr. Adam apparently was no better prepared this time. His testimony evidenced considerable confusion as to his bases for arriving at the projected gross farm income, primarily again with respect to sugar beets. The major problem is his insistance that he will obtain a price of $38 per ton for sugar beets for each of the three years of the proposed plan. He supported this position by relying almost exclusively on the fact that because of his good husbandry, the sugar content of his beets is far greater than average and so his price is historically above "factory average". He again lacked the records necessary to support this or other vague assertions. However, the bank had subpoenaed some of the necessary historical records from the sugar company and thereby established that in 1987 the sugar content of the debtors' beets was only about 4% above average and that in 1986 it was slightly below average. In short, there is no basis to believe that the price the debtors can expect to receive for their beets is likely to be much above the factory average, which has historically been below $35 per ton. Also, the debtors provided no evidence proving that the factory price of beets this year or in any future year will be significantly higher than in the recent past. Likewise, because of the drought this summer and the wet fall, we doubt whether the debtors will be able to yield a net of 19 tons of beets per acre this year. In the absence of any evidence to the contrary, we must presume that future years' prices and yields will approximate historical averages. *In re Crowley, supra; In re Konzak*, 78 B.R. 990, 994 (Bankr.D.N.D.1987). Numerous other flaws in the debtors' projections of farm income were incisively discussed by Walter Szostak, a financial analyst employed by the bank. Many of these went unrebutted by the debtors. Furthermore,

the detailed projections for this crop year's gross income were uncritically duplicated for next year although it was obvious from Mr. Adam's testimony that he does not intend the same crop mix next year. No projections for the third year of the plan were even offered.

The Bank cited *In re VZ Ranch, Inc.*, 69 B.R. 577, 581 (Bankr.D.Mont.1987) for the proposition that "a plan based on impractical or visionary expectations cannot be confirmed." Although this statement is, of course, correct, we need not and do not go so far as to call the debtors' plan "impractical or visionary". We merely hold that the debtors failed to carry their burden of persuasion on the issue. "The Debtors have failed to supply this court with sufficient information to allow a valid assessment of whether their future yield and income projections are within the realm of probability." *In re Konzak, supra*. They simply have failed to convince the Court that they will be able to make all the payments under the plan and to comply with the plan. As that is one of the elements that they were bound to prove, we must deny confirmation of their plan. An order will enter accordingly.