In re Wyman R. LUCHENBILL and Luchenbill Grain, Inc., Debtors.

Bankruptcy No. 88–12138.

United States Bankruptcy Court,
E.D. Michigan, S.D.,
at Flint.

March 8, 1990.

Joseph Mansfield, Lansing, Mich., for debtors.

Frank R. Vargas, Saginaw, Mich., for Genevieve Luchenbill.

Carl L. Bekofske, Flint, Mich., chapter 12 trustee.

Randall L. Frank, Bay City, Mich., for J.I. Case Credit Corp.

Marlene Dayne, Asst. U.S. Atty., Flint, Mich.

## MEMORANDUM OPINION ON GENEVIEVE LUCHENBILL'S MOTION TO DISMISS AND ON CONFIRMATION OF DEBTORS' PLANS OF REORGANIZATION

ARTHUR J. SPECTOR, Bankruptcy Judge.

On October 11, 1988, Wyman R. Luchenbill and Luchenbill Grain, Inc. filed separate petitions for relief under Chapter 12 of the Bankruptcy Code. Although both debtors are from Shiawassee County, which is next door to Genesee County, where this Court sits, the petitions for relief were inexplicably filed in Detroit. Nonetheless, both cases were transferred to the Flint Administrative Unit on October 13, 1988. On November 22, 1988, at the request of the debtors, the cases were joined for administration purposes only; consolidation of the estates was neither sought nor ordered. On January 9, 1989, the debtors filed one Chapter 12 plan titled in both of their names notwithstanding the fact that the corporate debtor and the individual debtor own different assets and, in certain instances, owe different debts. At the confirmation hearing on April 4, 1989, in addition to the other reasons stated, the Court explained that it could not confirm a "joint" plan when the estates were different and not consolidated. Though the Production Credit Association (PCA) and the Federal Land Bank, later called Farm Credit Bank (FCB), each of whom objected to confirmation, moved to dismiss the case, the Court denied the motion and permitted the debtors to file modified plans consistent with the Court's rulings within 14 days.

On April 19, 1989, the debtors filed their First Modified Plans. Notwithstanding the Court's admonitions at the April 4th confirmation hearing that the estates being separate, the plans must be separate, the new plans were substantially identical. The only apparent differences were that the debts due to the Shiawassee County Treasurer for unpaid real property taxes and to NBD–Genesee Bank on a loan secured by a mortgage on certain residential property were acknowledged and provided for in the individual, but not the corporate, case and that unsecured creditors were offered $2,500 in the individual case but only $500 in the corporate case. The similarities include: with the two exceptions noted, all of the creditors (secured and unsecured) are identical, all of the executory contracts are identical, all of the legal terms of the plans are identical; provisions for reformation of a mortgage to Genevieve Luchenbill, Wyman's ex-wife, are identical; and the liquidation analyses of these two estates are combined into one Liquidation Analysis which fails to separate the assets of these two estates.

■ On May 3, 1989, Mrs. Luchenbill filed an objection to confirmation of the plans. The confirmation hearing was begun on May 9, 1989 and was completed on May 23, 1989. Mrs. Luchenbill's objections were primarily that the plans were not proposed in good faith (11 U.S.C. § 1225(a)(3)) and did not provide for the full payment of her secured claim, in violation of 11 U.S.C. § 1225(a)(5). The parties disagreed as to the value of the assets securing Mrs. Luchenbill's claim. The Court determined that this collateral was worth significantly more than the amount estimated by the debtors and that there was therefore value to Mrs. Luchenbill's secured claim.[1] Since the plans provided her with no payment on her mortgage interest, the plan could not be, and was not, confirmed. Instead of dismissing the case, the Court again permitted the debtors to file new modified plans within 14 days.

On June 6, 1989, the debtors filed their Second Modified Plans. The corporate debtor's new plan acknowledged the results of the valuation finding of May 23, by providing that, for the first time, the secured claims of the third mortgage holder, Farmers Home Administration (FmHA), and of Mrs. Luchenbill, the fourth mortgage holder, would be paid in full with appropriate interest. Both the corporation's first amended plan and second amended plan contained this curious provision: "When the Debtor obtained his divorce from Genevive (sic) Luchenbill, he provided a deed to a certain parcel of property as part of the property settlement. However, . . ." [the plan goes on to provide a reformation to correct an error in the description]. The corporate debtor owns no real estate and obviously was never married to, let alone divorced from, Genevieve Luchenbill. This provision, which exists in the last three of the four plans filed by the corporate debtor, serves merely to highlight the terminal ambiguity the debtors have caused throughout this case.[2] No other changes from the first modification to the second modification appear in the corporate debtor's plan of reorganization.

The Second Modified Plan of the individual debtor is nearly identical, down to the same misspellings and typographical errors, to his first modified plan. Even though the Court determined that the FmHA's third mortgage was entirely secured and Mrs. Luchenbill's claim was partially secured, the new plan still provided,

---

**1.** The debtors took the position that the real estate was worth $591,700; Mrs. Luchenbill claimed it was worth $731,900. The Court determined that the real estate was worth $650,-000. The parties stipulated to the value of the machinery at $178,385. The crops were worth $152,000. The liens prior to Mrs. Luchenbill's fourth mortgage and Farmers Home Administration's third mortgage aggregated $877,463.88, leaving all of Farmers Home Administration's claim of $74,015.00 protected by collateral value. However, of Mrs. Luchenbill's total claim of $228,600, only $28,906.12 was determined to have "value", so her secured claim was limited to that amount. The remainder of her claim is an unsecured claim. 11 U.S.C. § 506(a).

**2.** This silliness was brought to the debtors' attention on June 23, 1989. Nevertheless it continued to appear in the corporation's Third and Fourth Modified Plans.

as did the previous one, which the Court rejected, that "(c)3. FmHA and Genevieve Luchenbill have no value or equity available to allow their claims as secured and shall be treated as unsecured." This provision, however, was contrary to the new paragraphs (b)3 and (b)4, which acknowledged the validity and extent of these creditors' secured claims and provided for them. What the plan gave with one hand, it took away with the other. No one, especially the trustee who would have had to make the payments under such a plan, if confirmed, would have been capable of interpreting the plan's provisions with respect to these creditors.

Mrs. Luchenbill objected again to confirmation of the plans, again arguing that the plans had not been proposed in good faith and this time, also that the debtors would not be "able to make all payments under the plan and to comply with the plan." 11 U.S.C. § 1225(a)(6). The hearing on confirmation of these plans was conducted on August 2, 1989. The Court concurred with Mrs. Luchenbill's feasibility objections and once again denied confirmation of the plans.

On August 14, 1989, Mrs. Luchenbill filed a motion to dismiss the cases. It was set for hearing on October 12, 1989, but adjourned to November 7, 1989. In the meantime, on September 26, 1989, the debtors filed their fourth plans, each entitled "Third Modified Plan". These plans are nearly identical to the Second Modified Plans. The only differences are a change in the starting date of the payments to FmHA and the correction of one typographical error and the inclusion of new ones in the provision dealing with reformation of the mortgages. Before confirmation of those plans could be considered, the debtors filed their fifth plans, each entitled "Fourth Modified Plan". These plans are almost identical to the Second and Third Modified Plans. The only substantive difference is in the treatment of Mrs. Luchenbill's secured claim. Whereas the earlier versions proposed paying Mrs. Luchenbill's

$28,906.12 secured claim over a 10–year period, the latest one proposed paying it off in a lump sum in December, 1989. Nonetheless, these plans continued to give with one hand and to take with the other as the negating language of paragraph (c)3 was carried over.[3] Mrs. Luchenbill, J.I. Case Credit Corp., and FmHA filed objections to the Third and/or the Fourth Modified Plans. Mrs. Luchenbill's objections this time were the same as the last: good faith and feasibility. A hearing on the issue of confirmation of the Fourth Modified Plans and the motion by Mrs. Luchenbill to dismiss was conducted on November 7, 1989, and the decisions were reserved. These questions are now decided.

### *§ 1225(a)(3)—"Good Faith"*

■ The debtor has the burden of proof to establish each of the elements for confirmation of a Chapter 12 plan. *In re Adam*, 92 B.R. 732 (Bankr.E.D.Mich.1988), including proving good faith. *Cf., In re Caldwell*, 895 F.2d 1123 (6th Cir.1990) ("Caldwell II") (dealing with good faith in Chapter 13 cases). If an objection to confirmation of a plan has not been timely filed, the court may "determine that the plan has been proposed in good faith and not by any means forbidden by law without receiving evidence" on the issue, Bankruptcy Rule 3020(b)(2). In this case, however, objections by Mrs. Luchenbill were timely filed. Therefore, the debtors were put to their proofs on this issue.

■ The Sixth Circuit has not yet had the opportunity to address the good faith standard as an element of confirmation of a Chapter 12 plan. However, the provisions of Chapter 12, and especially § 1225, are so closely patterned after Chapter 13 that interpretation of § 1325 is good precedent when confronting issues arising under § 1225. *In re Edwards*, 87 B.R. 671, 17 B.C.D. 1029, 19 C.B.C.2d 563 (Bankr.W.D. Okla.1988); *In re Schwarz*, 85 B.R. 829, 830–31, 17 B.C.D. 783 (Bankr.S.D.Iowa

---

**3.** When the Court brought this ambiguity to his attention on November 7, 1989, the debtor orally moved to delete paragraph (c)3 from his plan.

1988); *In re Snider Farms, Inc.,* 83 B.R. 1003, 1006 (Bankr.N.D.Ind.1988); *In re Danelson,* 77 B.R. 261, 263 (Bankr.D.Mont. 1987); 5 *Collier on Bankruptcy,* ¶ 1225.01 (15th ed.1989). Our circuit has addressed factors the court must consider when good faith is an issue in Chapter 13 cases. They include the following:

1. The amount of debtor's income from all sources;

2. The living expenses of the debtor and his dependents;

3. The amount of attorney's fees;

4. The probable or expected duration of the debtor's Chapter 13 plan;

5. The motivations of the debtor and his sincerity in seeking relief under the provisions of Chapter 13;

6. The debtor's degree of effort;

7. The debtor's ability to earn and the likelihood of fluctuation in his earnings;

8. Special circumstances such as inordinate medical expenses;

9. The frequency with which the debtor has sought relief under the Bankruptcy Reform Act and its predecessors;

10. The circumstances under which the debtor has contracted his debts and his demonstrated bona fides, or lack of same, in dealing with his creditors;

11. The burden which the plan's administration would place on the trustee.

*In re Doersam,* 849 F.2d 237 (6th Cir.1988). A somewhat different formulation was stated in another Sixth Circuit opinion in 1988. It laid out the following list:

(1) The amount of the proposed payments and the amount of the debtor's surplus; ...

(4) The accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court;

(5) The extent of preferential treatment between classes of creditors;

(6) The extent to which secured claims are modified;

(7) The type of debt sought to be discharged and whether any such debt is non-dischargeable in Chapter 7; ...

*In re Caldwell,* 851 F.2d 852, 859 (6th Cir.1988) ("Caldwell I"). *Also see In re Okoreeh–Baah,* 836 F.2d 1030, 1032, n. 3 (6th Cir.1988); *Memphis Bank and Trust Co. v. Whitman,* 692 F.2d 427 (6th Cir. 1982). Moreover,

> [N]o list is exhaustive of all the conceivable factors which could be relevant when analyzing a particular debtor's good faith.... We also stress that no one factor should be viewed as being a dispositive indication of the debtor's good faith.... "[T]he 'totality of the circumstances' test means what it says: It exacts an examination of all the facts in order to determine the bona fides of the debtor."

[Citation omitted]. *Caldwell I,* 851 F.2d at 860; *see also Doersam,* 849 F.2d at 239; *Okoreeh–Baah, supra.*

After consideration of many of these factors, we find that the plan was not proposed in good faith. The debtors' schedules failed to list a valuable parcel of land and failed to list real estate improvements (two houses on Goodall Road) that were later stipulated to be worth $61,700. Rental income for two homes was also not disclosed until after Mrs. Luchenbill raised the issue in Court. Not until the hearing on the confirmation of the debtors' First Amended Plans, on May 23, 1989, did the debtors acknowledge that Mr. Luchenbill owned another 14 acres of land which was not listed on the schedule of assets. This was only in response to Mrs. Luchenbill's accusation, which was backed by documentary evidence and a real estate appraiser. Although the value of the 14 acres may be minimal when viewed in the total scheme of things, the debtors' failure to list this parcel is an important factor when considered together with other, more material omissions.

The evidence showed that in 1988 the debtors had planted corn, soybeans and wheat. Although the corn and soy crop were still in the field on October 11, 1988, when the bankruptcy petitions were filed, the debtors had already harvested 5,000 bushels of wheat, which were sold for $16,590. Neither the harvested wheat nor its

proceeds were listed on either debtor's schedules. The nearly harvestable corn and soys were likewise not scheduled. Although the value of a growing crop is not easy to determine, that does not mean it has no value. An appropriate method of valuation is to estimate what a harvested crop would be worth and to deduct anticipated expenses to bring that crop to harvest. To that result, one must factor the risk of weather-induced losses and market forces. Of course, the earlier in the growing season the estimation occurs, the greater these discounts should be. Since the corn and soys here were close to maturity, not much of a discount would be justified. As it turned out, the debtors had a poor yield in 1988 (due to the drought), but still received $75,000 for the 30,000 bushels of corn and $52,500 for the 7,000 bushels of soybeans harvested.

■ The debtors argued that their failure to disclose the harvested wheat and the growing crops was not material because these crops were fully encumbered by the security interest of PCA. This misperceives the whole purpose for schedules and disclosure of assets. A complete and accurate list of assets is essential to the operation of the bankruptcy system. *In re Woodson,* 839 F.2d 610, 614 (9th Cir.1988); *Payne v. Wood,* 775 F.2d 202, 205 (7th Cir.1985), *cert. denied,* 475 U.S. 1085, 106 S.Ct. 1466, 89 L.Ed.2d 722 (1986); *In re Hussan,* 56 B.R. 288, 14 B.C.D. 45 (Bankr. E.D.Mich.1985). Materiality is not for a debtor to determine. A debtor's job is to disclose *all* assets, not to pick and choose among them. *In re Chalik,* 748 F.2d 616, 618 (11th Cir.1984); *In re Diodati,* 9 B.R. 804 (Bankr.D.Mass.1981); *In re Ramos,* 8 B.R. 490, 7 B.C.D. 458 (Bankr.W.D.Wis. 1981). The debtors' failure to list these valuable assets is a material breach of their important duty to the creditors, this Court and the bankruptcy system. In the much more difficult context of denying a debtor a Chapter 7 discharge, it has been held that fraudulent intent will be imputed if unscheduled assets have substantial value. *In re Syrtveit,* 105 B.R. 596, 597 (Bankr.D.Mont. 1989); *In re Topping,* 84 B.R. 840, 842 (Bankr.M.D.Fla.1988); *In re Galbraith,* 17

B.R. 302, 305 (Bankr.M.D.Fla.1982). Such intent may, at the least, be inferred from the circumstances. *In re Bobroff,* 58 B.R. 950, 952 (Bankr.E.D.Pa.1986); *In re Braidis,* 27 B.R. 470, 472 (Bankr.E.D.Pa.1983).

The failure to schedule the assets here is material not just on a theoretical basis, but on a very practical one as well. In these Chapter 12 cases, as in so many others we have seen, the main intent of the debtor is to pay as little as he is legally obligated to, as opposed to as much as the debtor is able. To do that, the debtor has an incentive to devalue his assets so as to maximize the effect of the cramdown. Additionally, a debtor is required to pay at least as much as his estate would otherwise yield to unsecured creditors if the case had instead been a Chapter 7. 11 U.S.C. § 1225(a)(4). This creates an added incentive for a Chapter 12 debtor to mislead other parties as to the true value of the debtor's assets.

Finally, the debtors' failure to disclose the existence of these crops begins a chain of falling dominoes of false impressions. Federal Land Bank (later called Farm Credit Bank) holds a first mortgage on Mr. Luchenbill's farmland; PCA holds a second mortgage in addition to a first security interest on the machinery and the crops. To the extent that there were crops in the bin or in the field when the petitions for relief were filed, there was collateral available to satisfy the prior liens of PCA. Through the equitable doctrine of marshalling, the existence of these crops "frees up" equity in the real estate for the benefit of junior lienors such as Mrs. Luchenbill. By leaving out the 14 acres, the two houses, the growing crops, the harvested crops and their proceeds, we find that the debtor actually intended to mislead the creditors, the trustee and this Court.

This conclusion is bolstered by the fact that the debtors obscured the true status of their estates by filing false, incomplete and misleading schedules, statements of affairs and other documents. Question 19 of the corporate debtor's Statement of Financial Affairs for Debtor Engaged in Business (Official Form No. 8) was inappropriately answered. Question #19a re-

quests individual proprietors to itemize personal withdrawals during the year before the bankruptcy was filed. Although the corporate debtor had no business answering that question, it nonetheless replied "general family living", an answer obviously inappropriate for a corporation. In its answer to question 19(b) of the Statement of Affairs, the corporation stated that "Corporate funds were used to pay FLB debt of Wyman Luchenbill", but notwithstanding the form's requirement, the debtor failed to disclose the dates and amounts of the withdrawals. Numerous other items of information requested by the Statement of Affairs were not answered at all or were answered witout providing necessary details. Its Schedule B–2 incorrectly lists ownership by the corporate debtor of general household furnishings, fishing poles, a pick-up truck and tools, all of which were also listed on Mr. Luchenbill's schedules as his own property. The corporation acknowledged ownership of $1,000 in deposits, but failed to describe it or its location, disregarding the requirements of Schedule B–2(b). It failed to describe and to provide the location of the farm machinery. And, as noted earlier, the schedules omit reference to growing or harvested crops. The corporation listed NBD–Genesee Bank, the first mortgage holder on Mr. Luchenbill's residence, and Mrs. Luchenbill, the third mortgagee on Mr. Luchenbill's farmland, as creditors on its Schedule A–2. Neither the bank nor Mrs. Luchenbill holds a claim against the corporate estate. Finally, many of the necessary details required by the schedules are omitted.

Mr. Luchenbill's responses in his own Statement of Affairs are also haphazard. Question # 7 asks for detailed information about the debtor's bank accounts. Although his response to the very same question asked in Scheduled B–2(b) reveals $1,000 in some account, the response to Question # 7a of the Statement of Affairs is "none". Question # 13 inquires into possible preferences. No response beyond "general operating expenses" was offered. Question # 19(a) asks for a disclosure of personal withdrawals from the business during the previous year. The useless answer was "general family living". On this topic, "general family living", Mr. Luchenbill failed to complete the one document designed to get at what an individual debtor's "general family living" income and expenditures are. This form, called a Schedule of Current Income and Current Expenditures, requires an individual debtor to disclose his "estimated average monthly income" and "estimated average current monthly expense" by listed categories. Instead of answering it, the debtor attached a copy of the farm's annual financial reports for the previous three years. Mr. Luchenbill's Schedule B–2 incorrectly lists ownership of farm equipment. A similar error appears in Mr. Luchenbill's answer to question # 7(b) in the Supplement to the Statement of Financial Affairs. What information is arguably correct in Mr. Luchenbill's schedules of assets is incomplete. The debtor failed, notwithstanding the requirement in the official form, to place a value on his real estate in Schedule B–1. He failed to disclose his interest in the stock of Luchenbill Grain, Inc. in response to Schedule B–2(t). He failed to describe and give the location of his personal assets, including his "pick-up truck" and "tools". As noted, he failed to itemize the location of the bank account he disclosed in Schedule B–2(b). His list of personal unsecured creditors exactly duplicates that of the corporate debtor.

An extremely important omission was Mr. Luchenbill's failure to disclose the fact that he is the landlord of two houses which he rents out to others for a combined rental of $575 per month ($6,900 per year). A debtor is required to complete a document entitled "Statement of Executory Contracts". The form requires disclosure of "all executory contracts including unexpired leases" to which a debtor is a party. Mr. Luchenbill prepared such a document, but listed only his outstanding contract with Agricultural Stabilization and Conservation Service (ASCS). No mention was made of his outstanding leases. Nor does this income appear on Mr. Luchenbill's Schedule of Current Income and Current Expenditures. And nowhere else in the

debtor's schedules or Statement of Affairs does this information appear. The leases and the income they generate were acknowledged only after Mrs. Luchenbill raised the issue at a contested hearing.

█ On August 2, 1989, debtors' counsel finally admitted that the schedules and the joint plan originally filed evidenced an aborted attempt to effectuate a *de facto* consolidation of the estates.[4] He acknowledged that the schedules and statement of affairs were wrong and should have been and would be amended.[5] The attempt to consolidate these estates without judicial approval or notice to creditors is more evidence of the debtors' unwholesome attempt to avoid their legal responsibilities to their creditors. Consolidation of two estates into one can be effectuated by use of Bankruptcy Rule 1015(b) (although it is an open question whether a corporate debtor and its sole stockholder qualify thereunder). The Court is required to protect the interests of the creditors in the separate estates as best it can if it does order consolidation. It is unable to even consider protection if consolidation is done *sub rosa* as was attempted here.

It is also important to consider the overall purpose and effect of the plans. The last version of the plans proposes payment in full to FCB, FmHA, NBD–Genesee Bank, ASCS, the State of Michigan, Shiawassee County Treasurer, and J.I. Case Credit Corp. The debtors propose to pay over $306,000 of PCA's $340,000 unsecured claim (90% thereof) and virtually nothing[6] to unsecured creditors. Mrs. Luchenbill, with an unsecured claim of $199,693.88, holds 82% of the unsecured claims. The other $42,992.67 is owed to six other creditors, five of whom can be fairly termed "trade creditors".[7] As to the five unsecured trade creditors, we have an uneasy feeling that their pre-petition unsecured claims will be "taken care of" somehow. Since the debtors' Statement of Affairs question 13(a) discloses that the debtors have been paying their "general operating expenses", it is fair to assume that the five trade creditors hold current bills and that the debtors filed their bankruptcy within the last billing cycle. If the debtors wish to purchase seed, fertilizer and fuel oil, for example, from these businesses in the future, one can expect that "arrangements" would be made to repay the pre-petition claims in some extra-judicial manner. That would leave only Mrs. Luchenbill and the one other non-trade creditor holding an empty bag. The fact that Mrs. Luchenbill is the debtor's ex-wife is not a point to be ignored. The debtors candidly acknowl-

4. Consolidation might have been in order if done above-board since, according to the debtors' counsel, the corporation issued no stock certificates and kept no minutes or separate financial books. However, it did file annual reports with the State of Michigan, paid all franchise fees, and filed all necessary tax returns. The reality was that Mr. Luchenbill owned and rented land, while the corporation owned the machinery and performed the actual farming operations. Mr. Luchenbill plans to take a wage of $16,000 per year from the corporation, as will Mr. Luchenbill's adult son (although the debtors' Statements of Financial Affairs fail to disclose payments to or receipts by either in years past.) Although nothing in the files indicates it, possibly the corporation also paid Mr. Luchenbill rent for the use of his land.

5. The Schedules, Statement of Affairs, etc. were never amended. Even if appropriate amendments had subsequently been filed, however, the prejudicial impression created by the debtors' failure to disclose assets and their obfuscation of the status of the estate would not be ameliorated; it is the attempt to mislead which goes to

the good faith of the debtor. *See e.g., In re Johnson*, 708 F.2d 865, 868 (2nd Cir.1983); *In re Estus*, 695 F.2d 311, 317 (8th Cir.1982); *In re Rimgale*, 669 F.2d 426, 432 (7th Cir.1982). *See also In re Cline*, 48 B.R. 581, 585 (Bankr.E.D. Tenn.1985); *In re Lewis*, 26 B.R. 379 (Bankr.D. Md.1982).

6. Each plan states: "Unsecured creditors to receive a $500 dividend over life of the Plan. Payments to be paid to Trustee in four (4) equal annual installments to be distributed on a pro-rata basis with the first installment due and payable 30 days subsequent to the confirmation of the Chapter 12 Plan." Whether this means that each debtor will pay $500 for a total of $1,000 to these unsecured creditors or that there would only be one $500 payment between them is unclear. Either way, since the unsecured debts in each plan's Class C total $242,686.55, each unsecured claim will receive less than one cent on the dollar over a four year period.

7. The sixth is an individual owed $3,850 for rent on land he leased to the debtors in 1984.

edge that malice plays a part in this case (although they undoubtedly view themselves as the aggrieved parties), as their counsel stated at the November 7th hearing, "This, in my opinion, is a spite case." *See In re Shands*, 63 B.R. 121 (Bankr.E.D. Mich.1985). Mr. Luchenbill has not paid his ex-wife any of the annual $15,000 payments due under their 1984 divorce judgment since 1986.[8] Mr. Luchenbill explained that the reason he did not pay any money in 1987 was that PCA took all of his money. Yet, somehow he managed to pay his operating expenses and land rent. Apparently, only Mrs. Luchenbill was excepted from payment. The plans would continue this disparity.

At the hearing on the confirmation of the debtors' Fourth Modified Plans conducted on November 7, 1989, Mr. Luchenbill testified that part of PCA's secured claim was comprised of its security interest in a 1982 GMC diesel pickup truck, which according to each debtor's Schedule B–2(f), was worth $7,500. Yet he conceded that PCA had failed to perfect its security interest by having its lien noted on the vehicle certificate of title. As any beginner in bankruptcy practice knows, this security interest was vulnerable to avoidance pursuant to § 544(a) of the Bankruptcy Code. *See In re Gilbert*, 82 B.R. 456 (Bankr.E.D. Mich.1988). Yet the debtors never sought that relief.[9] By failing to do so, the debtors would pay PCA $7,500 more than they had to on the secured claim, which money might have been available to (heaven forbid) pay a greater dividend to Mrs. Luchenbill. In this regard, we recall that Mr. Luchenbill said that the cause of the Chapter 12 was PCA, not Mrs. Luchenbill. Yet the debtors, represented by experienced insolvency counsel, let PCA slip off the § 544(a) hook. The inference is strong that it was purposeful.[10] In *In re Arnold*, 88 B.R. 917 (Bankr.N.D.Iowa 1988), the court held that a Chapter 12 debtor's failure to seek avoidance of a clearly avoidable lien was tantamount to treating that creditor more favorably than others, which necessitated denial of confirmation of the plan. We do not go so far. But we do think this is a factor which bears upon good faith.

The first version of the plan(s), filed on January 9, 1989, asserted that FCB had a fully secured first mortgage claim of $506,-967.12 on the 711 acres of farmland and that "[t]here is no equity or value available to pay" FmHA's second mortgage or Mrs. Luchenbill's third mortgage. Logically, if the first mortgage was fully secured and the second mortgage had no value, the debtors were saying that the 711 acres were worth exactly the balance due on the first mortgage, i.e., $506,967.12. Yet, on the date that plan was filed, the debtors were holding a report from an appraiser they hired showing that the value of the farmland alone, without the $61,700 in acknowledged improvements thereon, was $530,000. The same appraiser testified on May 23, 1989 that farmland had increased in value, in his opinion, by 3% since the date of that appraisal in September, 1988. The inescapable conclusion is that the debtors knew very well on January 9, 1989 that there was indeed equity available for the second mortgagee.[11] Clearly then, the

---

**8.** Mrs. Luchenbill, in a separate adversary proceeding, claims this obligation is non-dischargeable as in the nature of alimony or spousal support; Mr. Luchenbill, not surprisingly, disagrees, claiming the obligation is merely in the nature of an installment payment provision of a property division. The trial of this lawsuit has not yet been conducted.

**9.** We have no clue as to why the Chapter 12 trustee, the party who was primarily responsible for bringing trustee avoidance actions, 11 U.S.C. § 1202(b), failed to do so on his own.

**10.** In a stipulation appended to the debtors' First Modified Plans, the debtors stipulated that "PCA has a valid security interest ... on ...

motor vehicles and ... [t]hese liens shall be deemed to be perfected by the entry of an Order Confirming this Stipulation or an Order Confirming the Debtors' Chapter 12 Plans, whichever occurs first."

**11.** For no good reason, the debtors listed both PCA and FCB as one entity on each of their Schedules A–2. The debtors also improperly noted that the two creditors combined had security interests in the debtors' "711 acres, equipment crops", which the debtors estimated to be worth $597,000 in total. That the debtors also stated in Schedule B–2 that the equipment alone was worth $181,000, therefore leaving value of $416,000 for the 711 acres and the unscheduled

debtors proposed a plan which they knew was based on a false premise.

■ Finally, since the plans fix a finite amount for payment on unsecured claims ($500), should the debtors have an unusually profitable year during the term of the plans, none of that profit would inure to the unsecured creditors. The debtors, instead, would keep all of it. There are cases which go both ways on whether such a plan is confirmable. *Compare In re Akin*, 54 B.R. 700 (Bankr.D.Neb.1985) (such a plan violates the "all disposable income" test of § 1325(b)(1)(B)) *with In re Owens*, 82 B.R. 960, 17 B.C.D. 356 (Bankr.N.D.Ill.1988). At the very least, however, the fact that the debtors' plans make no provision whatsoever for increased payments upon the felicitous occasion of increased profits is a relevant factor in the good faith analysis. *Cf., In re Belt*, 106 B.R. 553, 569 (Bankr.N.D.Ind.1989).

■ These facts lead to the conclusion that the plans were not proposed in good faith. An exceedingly strong inference to this effect arises from *Caldwell I's* fourth factor: "The accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court." Some courts have held that "debtor misconduct, such as fraudulent misrepresentations or serious nondisclosures of material facts" is sufficient, without more, to deny confirmation due to a lack of good faith. *In re Gathright*, 67 B.R. 384, 387–88, 15 C.B.C.2d 1151 (Bankr. E.D.Pa.1986), *appeal dismissed*, 71 B.R. 343 (E.D.Pa.1987) (*quoting* 5 *Collier on Bankruptcy*, ¶ 1325.04 at 1325.12, 1325–10 (15th ed. 1986)). Whether this factor is, under the present state of the law in this circuit, itself sufficient to deny confirmation is not something we need to decide now. The fact that the debtors flunk this test woefully is at least one strong factor against confirmation.

*Doersam* factor # 5 additionally weighs very heavily against a good faith determination. We mistrust the motivations of the debtors for the reasons noted above. We believe that the "spite" impliedly attributed to Mrs. Luchenbill exists no less forcefully in Mr. Luchenbill. The facts, and most especially the results the plans would achieve, speak more loudly than Mr. Luchenbill's protestations to the contrary.

Other factors also militate against confirmation of the plans. The Court has a strong suspicion, based on inferences arising from the evidence discussed above, that there is preferential treatment given to the claims of certain creditors and to the detriment of Mrs. Luchenbill. (*Caldwell I* factor # 5). The plans originally sought to eradicate the secured claims of two of the four farm mortgages. The final version still seeks cramdown of almost $200,000 against a wife of 38 years.

*Caldwell I's* factor # 6 also militates against a finding of good faith. The Court has not yet determined the nature of the debt due to Mrs. Luchenbill. For applying *Caldwell I's* factor # 7, however, a final decision on that question is not a necessity. It suffices to say that the question of whether Mrs. Luchenbill's claim is in the nature of spousal support is still open. As that claim is far and away the largest, this factor, too, militates against confirmation.

*Doersam* factor # 11 points away from confirmation because the plans are so vague as to the dates and the amounts of the payments to creditors. Other inconsistencies and ambiguities were noted at the hearing. The Chapter 12 trustee, being infinitely practical and flexible, expressed his view that plan terms which create an illegal or inappropriate result would merely be "interpreted" by him out of existence. Accordingly, a four-year termination provision would be understood to mean four "crop years", so that all of the proceeds of

---

crops adds further confusion. One might therefore conclude that the debtors scheduled the farmland at only $416,000, notwithstanding an in-hand appraisal for $530,000.

Speculation should be unnecessary. Schedule B–1 requires a debtor to state "Market value of debtor's interest ...". Although Mr. Luchenbill already had the appraisal report when he filed Schedule B–1, the value of the land was not listed.

four full harvests would be devoted to plan payments. In some manner, involving examination of the proofs of claim, and pre-confirmation adequate protection agreements, he would divine the dates and amounts of payments to certain creditors. He would interpret the apparent cap provided by the plans on payments to unsecured creditors to instead become a floor. And he would interpret a provision in the plans which professes to fix the trustee's own compensation at less than that fixed by the United States trustee to be inoperative. Concededly, the counsel for the debtors consented to these many "clarifications". But the issue here is whether the *plan*—not side-bar agreements, etc.—would place an undue burden on the trustee. The mere fact that such contortions were necessary answers that question in the affirmative. *See In re Citrowske,* 72 B.R. 613, 16 C.B.C.2d 1228 (Bankr.D.Minn. 1987).

As Mr. Luchenbill never provided a schedule of his family living expenses, no fact finding on that point can be made. However, since the information is in his possession and since he has a duty to disclose it, an inference arises that the facts, if known, would be contrary to Mr. Luchenbill's interests. *N.L.R.B. v. Evans Packing Co.,* 463 F.2d 193, 197 (6th Cir.1972); *Berry v. School Dist. of Benton Harbor,* 442 F.Supp. 1280, 1299 (W.D.Mich.1977). Lending some support to this inference is the fact that the 1989 harvest produced sufficient income to allow the debtors to recently go on a capital acquisition spree. *See infra* at 217. *Doersam* factor #2 therefore must be weighed against confirmation.

In the context of this case, *Doersam* factors #4, #6 and #7 overlap to a great extent. We do believe that the debtors are putting forth their maximum effort to earn income. Although they could have sought to extend their plan to the statutory maximum 5 years in order to provide a more meaningful dividend to unsecured creditors, *see In re Kourtakis,* 75 B.R. 183, 187 (Bankr.E.D.Mich.1987), *Doersam* factors #4, #6 and #7 must still be considered as within the good faith column.

Except to note that the amount of the debtors' income from all sources is unknowable (uncertainties inherent in cash crop farming) and was partially undisclosed (e.g.: rental income), *Doersam's* factor #1 is of no moment. Other factors which either play no part in the outcome of this question or are in equilibrium are *Doersam* factors #3 and #9. Likewise, *Doersam* factor #10 was adequately covered by *Doersam* factor #5 and *Caldwell I* factors #5 and #7. Therefore, we will forego separate consideration of the evidence dealing with this factor.

On balance, then, the scales weigh heavily against a finding, necessary for confirmation of these plans, that "the plan has been proposed in good faith and not by any means forbidden by law." § 1225(a)(3).

### § 1225(a)(4)—Best Interests of Creditors Test

Mrs. Luchenbill also argues that the plans of these debtors cannot be confirmed because unsecured creditors would receive less via these plans than they would receive under a hypothetical liquidation of the estates under Chapter 7. Section 1225(a)(4) requires that before a plan may be confirmed the court must find that

> (4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date ...

*See* 5 *Collier on Bankruptcy,* ¶ 1225.02[4] (15th ed. 1989). At the April 4, 1989 confirmation hearing, the Court determined the value of the real estate and accepted the stipulation of the parties as to the value of the farm machinery. The value of the crops (harvested and unharvested) on the date the bankruptcy was filed, October 11, 1988, was also fixed. All of the land, crops and machinery were encumbered beyond their aggregate worth. The only unencumbered assets available at that time were the $1,000 in the bank and the 1982 pick-up

truck, which the schedules valued at $7,500, but for which an insurance company would pay only $4,500.[12] Even assuming the estates are combined, after administrative expenses of the estates are deducted from the $5,500, it would leave precious little, if anything, for unsecured creditors. Mrs. Luchenbill argues, however, that the date of valuation for the purpose of § 1225(a)(4) is the date of confirmation, not the date the petition was filed. She claims that the actual value of the 1988 crops was greater than the amount estimated by the Court and that the Court fixed the wrong date of valuation.

 Mrs. Luchenbill misconstrues the purpose of the valuation done in May, 1989. At that time the purpose of the valuation was to determine the amount of her secured claim. A claim is secured only to the extent that on the date the petition is filed there is value in the collateral supporting it. *In re Van Nort,* 9 B.R. 218 (Bankr.E.D. Mich.1981); *also see In re Beard,* 108 B.R. 322 (Bankr.N.D.Ala.1989). The valuation done at that time, therefore, was correct as a legal matter.

 Now, however, the purpose of the valuation is to apply the best interests of creditors test. The valuation of estate property for purposes of the best interests of creditors test must be as of the effective date of the plan, which cannot be before the confirmation of the plan. *Gribbons v. Federal Land Bank of Louisville,* 106 B.R. 113 (W.D.Ky.1989); *In re Bremer,* 104 B.R. 999 (Bankr.W.D.Mo.1989); *In re Musil,* 99 B.R. 448, 19 B.C.D. 409 (Bankr.D. Kan.1988); *In re Barnett,* 95 B.R. 477 (Bankr.W.D.Ky.1988); *In re Bluridg Farms, Inc.,* 93 B.R. 648, 19 C.B.C.2d 1081 (Bankr.S.D.Iowa 1988); *In re Milleson,* 83 B.R. 696 (Bankr.D.Neb.1988); *Colliers, supra* at 1225–9—1225–10. As the plans do not specify an effective date, the confirmation hearing date of November 7, 1989 shall be considered the effective date of the plans.

 On November 7, 1989, the debtors' estates consisted of:

### Wyman R. Luchenbill estate

| Asset | Gross Value | Liens | Exemption | Equity |
|---|---|---|---|---|
| Real Estate | $650,000 | >$650,000 | N/A | $ 0 |
| Tools | 500 | 0 | $500 | 0 |
| 1990 Chevy truck | 17,000 | 0 | 0 | 17,000 |
| Int'l truck | 10,000 | 0 | 0 | 10,000 |
| Household goods | 600 | 0 | 600 | 0 |
| Fishing poles | 50 | 0 | 50 | 0 |
| Total Equity Available | | | | $27,000 |

### Luchenbill Grain, Inc. estate

| Asset | Gross Value | Liens | Exemption | Equity |
|---|---|---|---|---|
| Machinery | $178,385 | >$178,385 | N/A | $ 0 |
| 1989 Corn proceeds | 43,840 | 43,840 | N/A | 0 |
| 1989 Corn harvested | 33,600 | 33,600 | N/A | 0 |
| Unharvested corn | 163,200 | 163,200 | N/A | 0 |
| 1989 Soybean proceeds | 142,270 | 142,270 | N/A | 0 |
| Grain auger | 800 | 0 | N/A | 800 |
| Bank accounts | 1,000 | 0 | N/A | 1,000[13] |
| Total Equity Available | | | | 1,800 |

12. Technically, the truck was encumbered, but the lien was subject to avoidance for the benefit of the estate. *See supra* p. 213. Subsequently, the truck was destroyed and the insurance settlement was only $4,500, not $7,500. *See infra* p. 217.

13. No evidence as to the balance on hand in the bank account on November 7, 1989 was received. The schedules filed as of October 11, 1988, however, disclose $1,000 in the bank. That was a time of maximum stress on the debtors, and was prior to the completion of an exceptionally poor harvest. On the other hand, November 7, 1989 was at the end of an exceptionally good harvest and at a time when the lenders were releasing funds for unrestricted use by the Chapter 12 debtors and the debtors

Notably omitted from the tabulation are the 1988 crops. For the same reason that the current crops are included, the 1988 crops are excluded. To produce the 1989 crops, the debtors had to sell the 1988 crops and pay the proceeds to PCA, the creditor holding the lien thereon. By making that payment, the debtors then became entitled to loan advances by PCA to enable them to plant and harvest the 1989 crop, upon which PCA received a replacement lien. Aside from the fairness and logic of excluding the 1988 crops, as an elementary matter, when one totes up the assets as of November 7, 1989, clearly the 1988 crops were no longer on hand.

■ For the same reason, the 1989 wheat crop is not computed. At the hearing on November 7, 1989, Mr. Luchenbill testified that his 1982 GMC diesel pick-up truck had recently been destroyed. He expected a $4,500 insurance settlement shortly. In October, 1989, PCA loaned him back the $27,670 of proceeds of the 1989 wheat harvest. As no restrictions were put upon these funds, he was free to use them as he wished.[14] He chose the following uses: the purchase of a new 1990 Chevrolet pick-up truck for $17,000; the purchase from his son of a used International truck for $10,000; and the purchase of a used grain auger. From other funds, Mr. Luchenbill also spent $1,500 to improve his tool shed by installing an addition. It also seems that the debtors had constructed a parking place to accommodate the additional truck.[15] These assets were indeed on hand on November 7, 1989 and were not encumbered. Therefore, if the cases had been converted on that date to Chapter 7, Mr.

Luchenbill's trustee would have received $27,000 and the corporation's trustee would have received $1,800. Mr. Luchenbill's plan proposes to pay unsecured claims only $500 over a period of four years. To perform the test properly, we should reduce the $500 to its present value. *See In re Hardy,* 755 F.2d 75 (6th Cir.1985). However, that extra step is unnecessary here, since the face or nominal amount of the plan payment proposed is clearly less than the amount available in a hypothetical liquidation under Chapter 7. Similarly, the $500 that the corporation proposes to pay unsecured claims through its plan is less than the $1,800 that a hypothetical Chapter 7 liquidation of that estate would yield. Therefore, Mrs. Luchenbill's objections on § 1225(a)(4) grounds must be sustained.

### § 1225(a)(6)—Feasibility

■ Mrs. Luchenbill also objects to confirmation of the plans on the ground that neither "debtor will be able to make all payments under the plan(s) and to comply with the plan(s)." § 1225(a)(6). This issue was extensively tried at the confirmation hearing of the Second Amended Plans on August 2, 1989. The Court concluded on that occasion that the debtors' projected 1989 revenue was $59,000 more than they would be able to achieve. Therefore, we held that the debtors would be unable to make a profit great enough to enable them to comply with the plans. We emphasized at that time that the *de facto* consolidated plans of the debtors were not feasible and suggested separate plans whereby Mr. Luchenbill would receive a distinct wage

---

were in a buying mood. It is safe to assume, therefore, that the cash in the bank on November 7, 1989 was certainly no lower than the $1,000 that was there on October 11, 1988.

**14.** Although the debtors' counsel argued that this new loan was authorized by the terms of the PCA adequate protection agreement of April, 1989, that assertion is untrue. While the agreement conditionally required PCA to re-loan to the debtors payments it received on the operating loan from crop proceeds, the new loans were restricted to use "only for costs and ex-

penses of planting and harvesting for the upcoming crop year." It did not provide for the releasing of funds for the purchase of capital equipment. It expressly prohibited use of the released funds for any payments under the Chapter 12 plan.

**15.** Mrs. Luchenbill insisted that the debtors must have also purchased a new stainless steel field sprayer, but in light of Mr. Luchenbill's denial of that allegation and no proof to the contrary, we find that no sprayer was purchased.

and/or rent income, and perhaps some less productive land could be abandoned. It was noted that the debt service requirements of the plans were just too great.

Mrs. Luchenbill relies heavily on the fact that since the Second Amended Plans were not confirmed on August 2, 1989, the debtors have amended the plans two more times without changing a thing. The proofs on November 7, 1989 bore out this assertion. The debtors had effected no changes in their operations. They still farm the same way they did before the case was filed: the same crops on the same land with the same equipment, etc. Thus, Mrs. Luchenbill argues, no "reorganization" has taken place in the more than one year that the cases have been pending. She argues that all the debtors have sought to do since August was to retry the issue of feasibility which they lost originally.

The debtors concede all this, but argue that the evidence has changed since August. In August, all they could do was estimate the yields and prices the current crop would bring. In November, they knew: 1989 was a banner year, both in yields and prices. Accordingly, the debtors argue, the plans are indeed feasible.

Unfortunately, the terms of their plans are not just one year. To perform their duties under the plans, the debtors will have to be fortunate enough to have three more consecutive years of friendly weather and reasonable prices. The debtors so concede. As we found in August, the projections for farm production for the four-year terms of the plan are reasonable only assuming four excellent years back to back. The only thing which changed from August to November was that the first year's projections proved to be reasonable, as the debtors' results actually surpassed those projections. The optimistic forecast for the next three years, however, continues to appear unreasonable. As the debtors bore the burden of proof on this as well as all other issues necessary for confirmation of the plan, *In re Adam, supra,* the Court determines that the plans are not feasible and may not be confirmed.

### Mrs. Luchenbill's Motion to Dismiss

█ Mrs. Luchenbill's motion to dismiss is premised on § 1208(c)(1): "unreasonable delay ... by the debtor that is prejudicial to creditors;" and on § 1208(c)(5): "denial of confirmation of a plan under section 1225 of this title and denial of a request made for additional time for filing another plan or a modification of a plan."

The delay in this case is from October 11, 1988 to November 7, 1989—over one year. A reasonable delay would include the 90-day exclusive period for the debtor to file a plan, § 1221, and another 45-day period for confirmation. § 1224. It is also not unusual for a court to permit a short extension to allow a debtor to modify an unconfirmed plan. Here, however, there have already been *four* modifications, the last two without leave of court. Thirteen months is too long to be reasonable. Thus, Mrs. Luchenbill has easily established that there has been unreasonable delay by the debtors.

More difficult is proving that the delay has been "prejudicial to creditors." It is apparent from Mr. Luchenbill's testimony that PCA has been receiving payments during the pendency of the case. From the stipulation and the lack of complaints by the creditor, it appears that FCB also has received $30,000, which the debtors agreed to pay in spring, 1989. We also assume that NBD–Genesee has been receiving its regular monthly residential mortgage payments. Therefore, those creditors seem not to be prejudiced by the delay. However, FmHA and Mrs. Luchenbill's secured claims apparently have not been paid, nor have they been offered adequate protection. Unsecured creditors, the predominant one being Mrs. Luchenbill, have, of course, been paid nothing in all this time. However, as noted above, during the past year, the debtors' estates have become enlarged due to the excellent 1989 operating

results. Thus creditors, generally, have not been prejudiced by the delay.

On the other hand, we have refused to confirm each plan the debtors have proposed. We have now denied confirmation of the fifth plan for each. The debtors have had more than ample time to propose a plan which is capable of confirmation, but have not done so. Extensions of time to file new Chapter 12 plans after the earlier has been denied confirmation are permissible but disfavored. *In re Bentson*, 74 B.R. 56, 15 B.C.D. 1320, 16 C.B.C.2d 1411 (Bankr.D.Minn.1987). After weighing the factors and considering the unusual length of time these cases have pended, the debtors' demonstrated lack of good faith in proposing their various plans, the little real change each modification has effected and all of the other evidence discussed above, we conclude that a request for additional time to file another plan or modification of a plan must be denied.

Mrs. Luchenbill cites *In re Pretzer*, 96 B.R. 790, 793 (Bankr.N.D.Ohio 1989) for the proposition that the Family Farmer Act (Chapter 12) was

> structured to require debtors to speedily confirm a plan of reorganization. The failure of a debtor to request additional time for filing further plans or modifications cannot be used by the debtor as a way to prolong its protection under Chapter 12 when there is no reasonable likelihood of reorganization. Such an action would constitute abuse of the bankruptcy system.

Here the debtors never sought leave to file a Third nor a Fourth Modified Plan. However, as no motion to dismiss the case was pending when the Second Amended Plan was denied confirmation on August 2, 1989, that denial left the cases sitting in limbo. As noted earlier, the Third Amended Plans were filed on September 26, a month after Mrs. Luchenbill moved to dismiss the cases.

Although we do not say that there is no reasonable likelihood that the debtors *can* reorganize, we do say that they have had long enough to attempt it. If a confirmable plan is out there, possible of accomplishment, the debtors have had ample opportunity to propose it and have failed to do so. We are satisfied that cause exists under § 1208(c)(5) for dismissal of these cases. Accordingly, orders dismissing these cases will be entered forthwith.